609 A.2d 431
IN THE MATTER OF THE ESTATE OF GEORGE
V. BRANIGAN, DECEASED.

Argued May 4, 1992—Decided August 3, 1992.

*Charles R. Buhrman* argüed the cause for appellants, First Fidelity Bank, N.A., Alan E. Branigan, and Robert James Branigan, as Co–Executors of the Estate of George V. Branigan, Deceased (*Hartman, Buhrman & Winnicki,* attorneys; *Charles R. Buhrman* and *Jack C. Darakjy,* on the brief).

*Richard Kahn* argued the cause for *amicus curiae,* New Jersey State Bar Association (*Matthias D. Dileo,* President, attorney; *Matthias D. Dileo,* on the letter).

The opinion of the Court was delivered by

HANDLER, J.

In this case the decedent executed a will creating two trust funds, one for his wife and the other for his children and grandchildren. Prior to his death, decedent failed to modify his will in order to take advantage of changes in the federal tax laws. As a result, the estate is subject to substantial federal estate taxes applicable to the trust established for the children and grandchildren. The issue posed in this appeal is whether the provisions of decedent's will creating the trust for children and grandchildren may be modified solely in order to exempt the trust from the imposition of federal estate taxes.

I

The decedent, George V. Branigan, died on July 4, 1988. He was survived by his wife; three sons, Robert James, William T., and Alan E.; and nineteen grandchildren. Six of those grandchildren are the children of George V. Branigan, Jr., the decedent's fourth son, who predeceased his father. His will named plaintiffs Robert James Branigan and Alan E. Branigan, two of the decedent's surviving sons, as co-executors under the will, with a power to designate a corporate fiduciary to serve with them as a co-executor and co-trustee. Plaintiff First Fidelity Bank N.A., New Jersey was later named as corporate fiduciary, and letters testamentary were granted to the three as executors on August 30, 1988.

The will essentially transfers to decedent's wife, Emma J. Branigan, all real property belonging to him at the time of his death. The will also provides for the creation of two trust funds for the disposition of decedent's personal assets. The first trust provides his wife with a portion of the estate equivalent to the maximum marital deduction available under federal tax law. The other trust, comprising the remainder of the estate, provides that in the event of the death of decedent's wife, the trustees will divide the principal among decedent's children, and on their deaths, decedent's grandchildren.

Although decedent's estate was exempt from certain federal estate taxes under the tax scheme existing at the time of the execution of the will, decedent failed to alter his will in order to obtain the benefits attributable to subsequent changes in federal tax laws with respect to federal estate taxes on the trust fund established for his children and grandchildren. Following the death of the testator, the procedure for the reduction of federal estate tax liability underwent further modifications. The executors of decedent's will therefore sought to reform decedent's will in order to take advantage of the changes in the federal estate tax laws subsequent to the execution of the will and subsequent to the death of the testator. All of the beneficiaries, including the grandchildren, who are of legal age, consented to the request by the executors to modify the terms of the testator's will.

The trial court denied that relief, holding that the "court does not have the power to reform a will." The court concluded that it may engage in will construction only when patent or latent ambiguities exist in a will. The Appellate Division affirmed in an unreported opinion. A dissenting judge suggested, however, that principles of will construction would permit a partial reformation of the trusts. Plaintiffs appealed as of right. *R.* 2:2–1(a). This Court granted the New Jersey Bar Association Section on Real Property, Probate and Trust Law leave to appear as *amicus curiae.*

## II

Decedent's will is a carefully-crafted document prepared and executed under the direction and guidance of skilled lawyers expert in matters of testamentary dispositions and estates, including tax considerations and consequences. The issue is whether that will can be reformed or modified in order to effectuate tax savings under existing tax law. A determination of that issue requires a full appreciation of the exact terms of the will itself and an understanding of the federal tax laws both

at the time the will was executed and following the death of the testator.

On April 16, 1982, decedent executed a will establishing two trusts, respectively designated "Fund A" and "Fund B." Fund A is a marital deduction trust designed to minimize estate taxes by establishing a Qualified Terminable Interest Property ("QTIP") trust. That form of trust takes advantage of the unlimited marital deduction that existed at the time of the execution of the will for property passing to a surviving spouse. The income is payable to or for the benefit of decedent's wife, with a further power in the corporate trustee at its own discretion to pay so much of the principal of Fund A as it may deem necessary to provide for her maintenance and support. In the event of his wife's death, the remaining principal in Fund A is added to and becomes a part of Fund B to follow the disposition therein.

Fund B consists of all the "rest, residue and remainder" of decedent's estate. The Trustees are directed to pay or apply the net income to or for the benefit of decedent's wife and his surviving sons, in such amounts and proportions as the corporate trustee shall determine, the remaining unpaid balance to be added to the principal. The corporate trustee is also given the power to use so much of the principal in its sole discretion for the benefit of the class members, consisting of decedent's wife and surviving sons.

On the death of decedent's wife, the trustees are directed to divide the principal of Fund B into equal shares for each living son and one such equal share for the then living issue collectively of any deceased son. The share set aside for the issue of a deceased son (the decedent's grandchildren) is paid over to such issue in equal shares per stirpes, unless such issue is under the age of thirty, in which case the share is to be held and disposed of pursuant to a separate paragraph. Each living son is entitled to the net income of the trust fund set up for his benefit, and the corporate trustee is authorized to pay so much

of the principal as it deems advisable for his education, maintenance or support.

Each living son is also granted the right to exercise a limited power of appointment in his own last will and testament of the remaining principal in the trust fund to a class of persons consisting of his issue. If the power is not exercised, the trustees are required on the death of that son to divide the principal into as many equal shares as there are then children of such son, the decedent's grandchildren. The income from the amount so held is to be paid or applied for the benefit of the minor grandchildren until they attain majority, with the net unpaid income applied to the principal of each grandchild's trust fund. When the grandchild attains his or her majority, the entire net income is to be paid to the grandchild, and at age thirty the grandchild may withdraw the entire principal together with any accumulated income. Under the will, all estate taxes are paid out of Fund B, with the exception of certain federal estate taxes.

Tax consequences were very much in the forefront of consideration by decedent and those who assisted in the preparation and drafting of the will. When decedent executed his will in 1982, transfers to grandchildren were not subject to an additional federal estate tax, known as Generation Skipping Transfer ("GST") taxes. GST taxes apply when the IRS taxes transfers that skip a second generation of transferees and pass taxable property to a third generation. However, the tax laws then in effect considered the child to be a transferor rather than a "skipped" generation and his or her appropriate tax rates were applied to property otherwise subject to GST taxes.

The Tax Reform Act of 1986 ("TRA") retroactively repealed the existing GST tax, however, and replaced it with a drastically revised GST tax, which, *inter alia,* imposed taxes on "direct skips." A direct skip is defined under the Internal Revenue Code as any transfer to a person two or more generations below the transferor; that is to say, trusts established for

grandchildren are subject to GST taxes. *I.R.C.* § 2612(b); *I.R.C.* § 2613(a)(1). The TRA makes all such direct skips taxable at a flat rate, whether the transfer is outright or in trust, except for direct skips to a grandchild of a predeceased parent. *I.R.C.* § 2612(c)(2). Consequently, Fund B under decedent's will is subject to GST taxes under the current tax regime.

The TRA also included new provisions for GST tax exemptions. First, it provided a $1,000,000 GST tax exemption for transferors of QTIP trusts. *I.R.C.* § 2631. The TRA provided that for GST tax purposes, any QTIP included in the surviving spouse's estate would be treated as having passed from that surviving spouse, *i.e.*, the surviving spouse would be the transferor of the taxable property for purposes of the $1,000,000 exemption. That exemption was in addition to the fact that the surviving spouse's QTIP trust qualifies for the marital deduction and is not taxable in the husband's estate.

Second, the TRA also allowed the executor to treat the QTIP trust as if no QTIP election had been made, in which case the first spouse to die is considered the transferor, and his or her GST tax exemption may be allocated to the trust. *I.R.C.* § 2652(a)(3). That special election came to be called the "reverse QTIP election."

Although those reverse elections apparently could be made to some trust property in order to apply both spousal exemptions to trust property, the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA"), enacted in November 1988, five months after decedent's death, retroactively modified reverse QTIP elections to require that those elections apply to *all* of the trust property designated as QTIP. Consequently, single QTIP trusts cannot make effective use of both spousal exemptions and must be divided.

On December 19, 1989, the executors sought to reform the will in order to avoid the imposition of GST taxes. They proposed to establish two marital deduction trusts instead of the single QTIP trust designated Fund A. That was to be

accomplished through two proposals. Under the first proposal, Fund B will be exempted from GST taxes by allocating $600,000 of decedent's $1,000,000 GST tax exemption to that trust. Then Fund A will be divided into two marital deduction trusts. The first of those trusts will be comprised of assets equaling decedent's remaining $400,000 GST tax exemption. The second marital deduction trust will consist of the balance of the unlimited marital deduction as finally determined for federal estate-tax purposes.

The court would then modify the provisions of Fund A so that the two newly created marital deduction trusts would specifically incorporate the provisions of Fund B and require that they continue to be held, administered, and disposed of in accordance with those provisions, at the death of decedent's wife, instead of being added to the principal of the trust set forth in Fund B. The effect of that proposal is that all provisions of Fund B would apply to Fund A on the death of decedent's wife.

The second proposed reformation is the expansion of the testator's sons' limited powers of appointment in Fund B from the power to appoint part or all of the trust fund's principal to a class of persons "consisting of his issue" to a general testamentary power of appointment. In that way, the trust property becomes part of the sons' federal gross estate and thus can be made subject to the sons' available federal estate tax credit and unlimited marital deduction with the attendant deferral and overall tax reduction potential. The entire estate thus escapes all possible GST taxes.

### III

A leading principle governing will construction is the doctrine of probable intent. The doctrine of probable intent has developed over the years through a series of cases in which courts construed the language of a will in a fashion contrary to its literal, technical, or settled meaning. *See Bottomley v. Bot-*

*tomley,* 134 *N.J.Eq.* 279, 291, 35 *A.*2d 475 (Ch.1944) (recognizing that "[t]he power of this court to effectuate the manifest intent of a testator by inserting omitted words, by altering the collocation of sentences, or even by reading his will directly contrary to its primary signification is well established.") (citations omitted); *In re Devries,* 36 *N.J.Super.* 29, 35, 114 *A.*2d 742 (App.Div.1955) (citations omitted). The doctrine of probable intent served both to accommodate and modify other common-law doctrines governing the interpretation of wills. One doctrine emphasized the importance of plain meaning, in which the plain meaning of the testator's words were invested with a strong presumption that they accurately expressed the testator's intent. *In re Estate of Armour,* 11 *N.J.* 257, 271, 94 *A.*2d 286 (1953). Another common-law doctrine, known by its Latin rubric, *falso demonstratio non nocet,* allowed the court to excise the less essential particulars or details from the description of a testamentary provision provided that the remainder of the testamentary disposition preserved its essential terms. *Weiss v. Rheinstein,* 50 *N.J.Super.* 308, 314, 142 *A.*2d 104 (App.Div.1958).

▮ Our understanding of the probable intent doctrine is expressed in *Fidelity Union Trust Co. v. Robert,* 36 *N.J.* 561, 178 *A.*2d 185 (1962). This Court stated that

in ascertaining the subjective intent of the testator, courts will give primary emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances....

So far as the situation permits, courts will ascribe to the testator "those impulses which are common to human nature and will construe the will so as to effectuate those impulses."

[*Id.* at 564–65, 178 *A.*2d 185 (citations omitted).].

Courts are enjoined to "strain" toward effectuating the testator's probable intent "to accomplish what he would have done had he envisioned the present inquiry." *Id.* at 564–68, 178 *A.*2d 185. The doctrine was applied in later cases. *See Engle v. Siegel,* 74 *N.J.* 287, 377 *A.*2d 892 (1977); *In re Estate of Ericson,* 74 *N.J.* 300, 377 *A.*2d 898 (1977); *Wilson v. Flowers,* 58 *N.J.* 250, 277 *A.*2d 199 (1971); *In re Estate of Burke,* 48 *N.J.*

50, 222 *A*.2d 273 (1966); *In re Estate of Cook*, 44 *N.J.* 1, 206 *A*.2d 865 (1965).

In *Engle*, a husband and wife left separate wills that stated that in the event of common disaster, the residuary estate would be divided equally between that testator's mother and his or her respective parent-in-law. *Engle, supra*, 74 *N.J.* at 289, 377 *A*.2d 892. Since the husband's mother had predeceased him, the wife's mother claimed that the entire residuary estate passed to her. The Court, however, reformed both wills to permit the husband's side of the family to take the share belonging to the predeceased parent, despite the fact that the will made no dispository reference to his side of the family.

The Court derived its interpretation from extrinsic evidence indicating that both testators wanted their estates to go to each of their respective families, but the attorney who drafted their wills recommended the use of more precise language to designate the class of persons constituting their families. *Id.* at 295, 377 *A*.2d 892. The testators then chose to divide their property between their respective mothers. The Court stated that to give the assets of both estates to Mrs. Engle "would seem to fly directly in the face of all the evidence bearing upon probable intent." *Id.* at 296, 377 *A*.2d 892. Consequently, *Engle*'s interpretation of the probable intent doctrine provides the Court with wide discretion to construe wills according to the testator's intent, such intent to be determined from a variety of extrinsic sources.

In *Ericson*, this Court applied the doctrine of probable intent to effectuate the testator's imputed intent to minimize taxes by excising from a will language that clearly contradicted the testator's estate plan and frustrated his intention to maximize the marital deduction and minimize estate taxes. The Court observed:

> It is argued that Mr. Ericson was uninterested in minimizing taxes, because he never discussed the subject. This conclusion is not justified. Every testator is entitled to assume, absent evidence to the contrary, that his lawyer will undertake to accomplish his testamentary wishes with as little tax impact as

> possible. Furthermore, it is normally and quite rationally presumed that this is
> what the testator wishes. Any other belief, absent evidence to support it, is
> fatuous. [74 *N.J.* at 309, 377 *A.*2d 892.]

*See also Gesner v. Roberts,* 48 *N.J.* 379, 381, 225 *A.*2d 697 (1967) (suggesting that "[a]bsent an express statement in the will, we should start with the assumption that the testator intended the maximum tax advantage for the estate and the maximum benefit to the spouse within the limits of his gift to her"); *In re Estate of Rankin,* 169 *N.J.Super.* 317, 327, 404 *A.*2d 1200 (App.Div.1979) (finding that "a testator intends the maximum tax advantage for his estate"); *In re Estate of Schock,* 226 *N.J.Super.* 67, 72, 543 *A.*2d 488 (Law Div.1988) (noting that "[o]ne must be just in paying taxes due under the law; one need not be generous").

The doctrine of probable intent as it has evolved is sufficiently broad to accommodate plaintiffs' request to alter the trust funds for purposes of minimizing GST taxes. Indeed, the doctrine has been applied in contextual settings in which the imputation of the presumed intent to minimize taxes was necessary to prevent the frustration of the testator's overall testamentary plans. *See, e.g., Ericson, supra,* 74 *N.J.* at 306, 377 *A.*2d 898 (determining that intent to minimize taxes constituted one of testator's primary intentions in drafting will); *In re Estate of Rankin, supra,* 169 *N.J.Super.* at 326–27, 404 *A.*2d 1200 (determining that allocation of tax burden to charitable beneficiaries would be contrary to testator's intent to minimize estate taxes). Similarly, this case presents evidence material to the testator's intention with respect to the significance of federal taxes as a factor in his testamentary plan. Considerable evidence supports the finding that decedent had specifically attempted to minimize QTIP taxes generated under the existing will. Article IV, the article in decedent's will discussing the payment of all estate taxes, states that all such taxes are to be paid from the principal of Fund B without apportionment. Nevertheless, the decedent makes a particular exception with respect to QTIP taxes: "excluding, however, any and all such

taxes, interest and penalties attributable to the inclusion in my estate for Federal Estate Tax purposes of 'qualified terminable interest property' as defined under Internal Revenue Code." The reason that decedent included that provision is obvious: decedent knew that he could apply the marital deduction exemption to all of the federal estate taxes existing at that time if the QTIP taxes were included under Fund A rather than Fund B. Therefore, we find that extrinsic evidence amply supports a finding that decedent intended the maximum tax advantage for his estate.

In addition to the extrinsic evidence supporting decedent's specific intent to minimize taxes, the doctrine of probable intent reasonably assumes, in its several possible applications, a widely-accepted intent on the part of most testators to save taxes. The basic principle underlying the doctrine of probable intent is that it is reasonable to impute to the decedent a general intent that reflects "impulses ... common to human nature." *Roberts, supra*, 36 *N.J.* at 565, 178 *A.*2d 185. That general principle had been applied in *Gesner* and *Ericson* to demonstrate that the testator's desire to achieve maximum estate tax savings reflects such common impulses and should be invoked as a factor in shaping his or her testimonial plan. *See Ericson, supra*, 74 *N.J.* at 309, 377 *A.*2d 898; *Gesner, supra*, 48 *N.J.* at 381, 225 *A.*2d 697.

▮ Moreover, in this case the imputation of an intent on the part of the testator to incorporate in his will those technical provisions essential to achieve tax savings is not hampered by any possibly conflicting purpose relating to other aspects of his will. Unlike *Engle* and *Ericson*, effectuating an intent to save taxes in the matter before us does not entail the alteration of a substantive provision of decedent's will. Plaintiffs can secure part of the tax savings they seek under the current federal tax laws by dividing the single QTIP trust into two QTIP trusts. That division does not affect or change any substantive disposition or bequest under decedent's will. The beneficiary, pur-

poses, and powers of the trusts will remain intact. Moreover, the splitting of the trust does not entail modification of a material or significant administrative provision or structural feature of the will. Rather, the modification constitutes only a technical alteration relating to an aspect of estate administration that does not otherwise appear to have any material bearing on the decedent's testamentary plan. The change of that administrative provision is designed solely to conform the will to the existing federal tax scheme, an objective sought to be achieved by the testator. *Cf. In re Will of Ranney*, 124 *N.J.* 1, 11, 589 *A.*2d 1339 (1991) (stating that substantial compliance doctrine determines whether technically defective will expresses decedent's intent and serves underlying purpose of will statute); *In re Estate of Peters*, 107 *N.J.* 263, 272, 526 *A.*2d 1005 (1987) (noting that substantial compliance doctrine relaxes extent to which statutory formalities must be honored).

We therefore conclude that plaintiffs' request to reform decedent's will to modify the existing provisions of trust funds in order to derive maximum benefits under the federal estate tax laws is reasonable.

## IV

The reasoning that enables us to sanction a change in the will with respect to certain of its structural and administrative features but not the substantive terms of trust bequests prevents us from authorizing the reformation of the will to alter the testator's sons' limited powers of appointment. We understand that very substantial federal taxes could be saved by that change. Moreover, the executors argue that that modification will revitalize the original intent of the testator by making the donee of the power the deemed transferor and tax the skip property at the son's own rates. Further, the executors claim that such modifications would not be detrimental or contrary to either the Federal Transfer Tax or New Jersey's Inheritance Tax policy. The modification, however, certainly

would alter the dispository provisions of the will. Under that proposed scheme, the interests of the grandchildren whose fathers were living at the time of decedent's death could be affected by making their father's power of appointment general with the possibility they could lose their inheritance.

We are not persuaded by decisions of the Surrogate courts of New York cited to support plaintiffs' position. Those decisions are exemplified by *In re Will of Lewis*, 144 *Misc.*2d 618, 544 *N.Y.S.*2d 719 (Sur.1989), in which the Surrogate court reformed a decedent's will by providing grandchild beneficiaries with a general power of appointment where none previously existed. Although the court conceded the possibility that a great-grand-child would not recover under the will, it determined that that possibility was remote and not in conflict with the intentions of the testatrix.

In this case, unlike *Lewis*, the provision associated with the articles of the trust funds are a central part of the decedent's intended dispository scheme. Further, the decedent clearly intended that his sons' powers of appointment should be limit-ed. Article VI of the decedent's will specifically provides that "[u]nder no circumstances shall *any* of my sons be considered to possess the right to exercise this power of appointment directly or indirectly for the benefit of himself, his estate or the creditors of his estate."

We cannot conclude that plaintiffs' desire to evade taxes at the cost of the dispository scheme and the possible disinheri-tance of some of the heirs effectuates the testamentary intent of the testator. If plaintiffs and the beneficiaries wish to alter their shares, they may pursue statutory relief. *See N.J.S.A.* 3B:23–9 ("Subject to the rights of creditors and taxing authori-ties, competent successors may agree among themselves to alter the interest, shares, or amounts to which they are entitled under the will of the decedent, or under the laws of intestacy, in any way that they provide in a written contract executed by all who are affected by its provisions").

## V

The judgment of the Appellate Division is affirmed in part and reversed in part and the cause remanded to the trial court for further proceedings consistent with this opinion.

CLIFFORD, J., dissenting.

Only prompt application of the jurisprudential equivalent of the Heimlich maneuver can save the doctrine of probable intent from today's hard-to-swallow decision.

The Court says that despite its unmistakable clarity, the will of decedent, George V. Branigan, can be reformed—not explained, not interpreted, mind you, but *changed*—to permit the estate to take advantage of certain tax advantages produced by amendments to the federal-tax laws enacted after execution of the will but both before and after (with retroactive effect) decedent's death. Despite the case's "tax" orientation, one need not be a tax-law expert to understand the issue posed by this appeal—and a good thing, too. I am put in mind of my own reference, some fifteen years ago in *Oakwood at Madison, Inc. v. Township of Madison*, 72 *N.J.* 481, 371 *A.*2d 1192 (1977), to former-Judge Rifkind's observation on the subject of tax law that " '[a]fter 50 years of practice, I would no more have the audacity to formulate my own tax return than I would engage in open heart surgery.' " *Id.* at 636, 371 *A.*2d 1192 (concurring opinion) (quoting Simon H. Rifkind, *Are We Asking Too Much of Our Courts?*, 15 *Judge's J.* 43 (1976)). What one must understand, however, is that whatever the tax consequences of the decedent's testamentary disposition, the will could not have been clearer in its articulation of its trust provisions.

The Court holds that those provisions may now be altered to minimize the federal-tax impact on the estate. I am for tax minimization as much as the next taxpayer, but I am not willing to warp a respectable principle of law to achieve that end.

Branigan had no intent whatsoever in respect of the generation-skipping tax, and nothing in his will gives any inkling of his slightest concern in that regard. Not the most intensive examination of the document will reveal any accommodation of that tax, much less any ambiguity in language seeking to address it. And therein lies the key, for my purposes.

My understanding of the doctrine of probable intent appears in a dissenting opinion in *Engle v. Siegel*, 74 *N.J.* 287, 377 *A.*2d 892 (1977). Despite its failure to have drawn a crowd then or since, my view in *Engle* continues to guide my approach to this case. I repeat it here:

> As I understand the operation of the doctrine of probable intent, an ambiguity in the instrument is the condition [that] triggers the doctrine's application to change the result [that] would attend a literal application of the language of the will.
>
> [*Id.* at 298, 377 *A.*2d 892 (dissenting opinion).]

And:

> [T]he doctrine of probable intent should not be used to *create* an ambiguity in a will [that] the doctrine will then be called upon to decide.
>
> [*Ibid.*]

Because the triggering circumstance, namely, an ambiguity, for application of the doctrine simply does not exist, the Court's laudable rescue operation fails. The majority opinion's creativity is dazzling: cobbling two trusts out of the testator's Fund A ("Fund A will be divided into two marital-deduction trusts," *ante* at 331, 609 *A.*2d at 435); divvying up the assets from one of the testator's trust between the revisionists' two new trusts ("The first of those trusts will be comprised of [specified] assets" and the second "will consist of the balance," *ante* at 331, 609 *A.*2d at 435); and, finally, modifying (translated: inventing) the provisions of one of the testator's trusts by incorporating the terms of his second trust ("[T]he two [newly-created] marital-deduction trusts would specifically incorporate the provisions of Fund B and require that they continue to be held, administered, and disposed of in accordance with those provisions, at the death of decedent's wife, instead of being added to the principal of the trust set forth in Fund B." *Ante* at 331, 609 *A.*2d at 435). Everyone goes away happy—even, apparently, the federal-tax authorities, who are willing to "go

along" with the nifty new arrangement but not willing to promulgate a regulation to codify their acquiescence. The only "victim" is the law.

Because I continue to harbor an abiding conviction that the area of testamentary dispositions is the last place for creative jurisprudence such as the Court exercises today, and because the doctrine of probable intent has absolutely no legitimate role in the decision of this appeal, I would affirm.

STEIN, J., concurring in the result.

*For affirmance in part; reversal in part; and remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For affirmance*—Justice CLIFFORD—1.