910 A.2d 634 (2006)
389 N.J. Super. 22
In the Matter of The PROBATE OF the WILL OF Samuel LEE, deceased.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 2006.
Decided November 30, 2006.
*635 Walter A. Saurack, New York, NY, argued the cause for appellant Trustees of Stevens Institute of Technology (Satterlee Stephens Burke & Burke, attorneys; Mr. Saurack, on the brief).
Peter R. Bray, Parsippany (Bray, Chicocca & Miller, attorneys) argued the cause for respondent Betty MacDonald, and Lorraine A. Abraham, Hackensack (Schiffman, Abraham, Kaufman & Ritter, attorneys) argued the cause for respondent Alan Merker (Richard I. Miller and Ms. Abraham, on the joint brief).
*636 Before Judges STERN, A.A., RODRÍGUEZ and BAXTER.
The opinion of the court was delivered by
STERN, P.J.A.D.
The trustees of Stevens Institute of Technology, one of two charitable residuary legatees under the will of Minerva Lee, appeal from a judgment of August 26, 2005, which directed that taxes payable from the corpus of Qualified Terminable Interest Property (QTIP) trusts created under the will were to be paid before the distribution of the residuary estate, resulting in a reduced residuary estate for distribution to the charities under Article IV of Minerva's will.[1] The issue arises incident to the probate of the will of Minerva's husband, Samuel Lee.
Specifically, the contested order provides that "taxes payable by the QTIP trusts by virtue of inclusion in [d]ecedent [Samuel's] gross estate shall be paid out of the Trusts' corpus before distribution, and the remainder shall be then distributed in accordance with the terms of Article Fourth of Minerva Lee's will." In essence, in his August 5, 2005 decision, the probate judge concluded that Minerva's bequests to her daughter, Betty MacDonald, and Betty's family were not to be reduced by the amount of taxes attributable to the QTIP trusts, and that the taxes were to be paid from the trust corpus before the distribution to the charities.
Appellant argues that "the probate court erred because it did not exonerate the charitable beneficiaries of the QTIP trusts from the federal estate taxes attributable to the QTIP trusts [under federal law]" and "because it did not exonerate the charitable beneficiaries of the QTIP trusts from the New Jersey estate taxes attributable to the QTIP trust in accordance with New Jersey case law."

I.
Samuel and Minerva Lee were married and had one child, David, who passed away in 1987. David was not married and had no children. In October 1998, Minerva adopted Betty MacDonald, who was the daughter of her deceased twin sister. Particularly after David's death, Betty and Minerva became very close. It is undisputed that "Betty provided the assistance and care Minerva and Sam required due to their advancing age [and that] Minerva was extremely grateful to Betty and wanted to ensure that this care would continue in the event Minerva predeceased Sam."[2]
Minerva died on February 18, 1999, leaving a Last Will and Testament and a codicil, both dated November 23, 1998.[3] The will, which was admitted to probate on April 1, 1999, created the QTIP trusts. Article Third of Minerva's will directed that her residuary estate was to be divided into a "Spouse's Part Trust" and "Family Part Trust" for Samuel's benefit during his life. Minerva's will further provided the manner in which the QTIP trusts would be distributed after his death and for the payment of estate taxes.
*637 Specifically, Article First of Minerva's will related to the payment of taxes on her estate. It provided:
(b) I direct that all estate, inheritance, transfer, legacy or succession taxes, including state and federal, which may be assessed or imposed upon the transfer of any property under this Will, or upon property which may be part of my taxable estate for the purpose of any said tax shall, in the event my husband, SAMUEL LEE, survives me, be paid out of the Family Part of my residuary estate, as hereinafter defined in Article THIRD, it being my intention that the Spouse's Part and any other property passing to my husband which is not included in my estate for federal estate tax purposes be exonerated to the greatest extent possible from payment of all said state or federal taxes. In the event my said husband, SAMUEL, does not survive me, said taxes shall be paid out of my residuary estate. Notwithstanding the foregoing, if any tax shall be payable at, after or with respect to my death, pursuant to Internal Revenue Code Section 2036 (as permitted under 2207B), Section 2041 or Section 2044 or Chapter 13 of the Internal Revenue Code of 1986, as amended, or corresponding provision under state law, no part of such tax shall be paid from my estate.
Any estate and other related taxes due at my death by virtue of any charitable remainder unitrust or any other trust created by me during my lifetime, shall be payable from my residuary estate. It is my intent that the secondary beneficiaries of such trust(s) shall not be liable for any of such taxes.
Article Third divided the residuary estate into two parts:
In the event my husband, SAMUEL, shall survive me, my entire residuary estate shall be divided into the following two parts:
The first such part, hereinafter called the "Spouse's Part," which shall constitute a pecuniary legacy and not a fractional share of my estate, shall be equal in value to that amount determined pursuant to Article TWELFTH of this Will.[4]
The second such part, hereinafter called the "Family Part," shall consist of the remainder of my estate after the allocation of assets to the "Spouse's Part."
Each part was then placed in trust.
Article Fourth embodied the residuary estate. It provided:

*638 Upon the death of my husband, SAMUEL, any balance of property remaining in the trusts being administered under paragraphs (1) and (2) of Article THIRD, or in the event my said husband, SAMUEL, does not survive me, all the rest, residue and remainder of my estate, as the case may be, I give, devise and bequeath to my trustees, as follows:
First, I give and bequeath the sum of One Hundred Sixty Five Thousand ($165,000.00) Dollars to my child, BETTY MacDONALD, absolutely and forever, if living, and if not, to her lawful issue, per stirpes, and if none, then this legacy shall lapse;
Second, I give and bequeath the sum of Six Hundred Thousand ($600,000.00) Dollars to my trustees, hereinafter named, to be held for the benefit of my child, BETTY MacDONALD, for the following uses and purposes:
. . . .
Third, all the rest, residue and remainder of my estate I give and bequeath as follows:[5]
(1) One-half (½) thereof I give, devise and bequeath to the Endowment Foundation of North Jersey and Greater Clifton-Passaic Federations [now known as "UJA"] . . . ;
One-half (½) thereof, I give, devise and bequeath to Stevens Institute of Technology, located in Hoboken, New Jersey.
[Emphasis added.]
As recited in the Settlement Agreement, "Minerva's Executors elected to divide, and did divide, the Spouse's Part Trust into two separate trusts (collectively, the `QTIP Trusts'), and elected to treat the QTIP Trusts as qualified terminable interest property under § 2056(b)(7) of the Internal Revenue Code of 1986." That election deferred the tax on the trusts until Samuel's death when the value of the trusts became part of his gross estate[6] under 26 U.S.C.A. § 2044.[7]
On November 23, 1998, Samuel executed a Last Will and Testament. He also executed codicils in August and September 2002. On February 26, 2003, he executed a new will which provided for charitable donations different than his wife's bequests and did not provide for Betty.[8]
Samuel died on March 12, 2003. In accordance with Minerva's will, the QTIP trusts were included as part of his taxable estate.
On March 28, 2003, the executor appointed in Samuel's 2003 will filed a complaint in the Probate Part, seeking an order admitting the 2003 will to probate. Betty filed a caveat alleging, among other things, that the 2003 will had been "the product of undue influence and/or executed without testamentary capacity." Betty sought to set aside the 2003 will and admit Samuel's 1998 will and subsequently executed codicils to probate. One of the issues *639 involved "the apportionment of the estate tax liability generated as a result" of including the QTIP trusts established in Minerva's will as part of Samuel's taxable estate.
On March 28, 2005, the parties entered into a settlement agreement, admitting the 2003 will to probate.[9] The settlement agreement provided in part:
The QTIP Trusts shall be required to pay Samuel's estate an amount equal to (a) the total amount of federal estate taxes and New Jersey estate taxes payable by reason of Samuel's death, less (b) the total amount of those taxes which would have been payable by reason of Samuel's death if the QTIP Trusts had not been includible in Samuel's gross estate for federal estate tax purposes (collectively, the "Estate Tax Contribution Amount").
With regard to payments by the QTIP trusts, the settlement agreement also stated:
Within five (5) business days after the Effective Date of this Agreement, the QTIP Trust shall pay to Samuel's estate an amount equal to one-half (½) of the fair market value as of the date of Samuel's death of all the assets owned by the QTIP trusts as of that date (the "Approximate Estate Tax Contribution Payment"), on account of the QTIP Trusts' aforesaid obligation to pay Samuel's estate for such estate taxes. Upon the completion of the federal estate tax proceeding and the New Jersey estate tax proceeding for Samuel's estate, the QTIP Trusts shall thereupon pay to Samuel's estate (if the amount of the Approximate Estate Tax Contribution Payment is less than [the] Estate Tax Contribution Amount), or Samuel's estate shall pay the QTIP Trusts (if the Approximate Estate Tax Contribution Payment is more than the Estate Tax Contribution Amount) the difference between the Approximate Estate Tax Contribution Payment and the Estate Tax Contribution amount.
Within five (5) business [days] after the Effective Date of this Agreement, the QTIP Trusts shall pay to Samuel's estate an amount equal to one-half (½) of the aggregate sum of the fiduciary income received or accrued by, plus the net principal gains (both realized and unrealized) earned by, the QTIP Trusts from December 12, 2003 through the Effective Date of this Agreement (the "Income Component"). Upon the computation of the Estate Tax Contribution Amount and the determination of the adjustment, if any, required by the immediately preceding paragraph of this Agreement, the Income Component shall be similarly adjusted.
Under the Settlement Agreement, the 2003 will was admitted to probate in the "Final Judgment" entered on May 16, 2005. The Settlement Agreement, however, did not resolve all the issues among the parties. It did not resolve issues relating to the payment of estate taxes and the impact thereof on the balance of the QTIP trusts and Family Part Trust and the *640 amounts for distribution among the remainder beneficiaries. As a result, "the trustees of the QTIP Trusts and Family Part Trust and all the remainder beneficiaries of those trusts reserve[d] all of their rights" to contest the allocation and payment of federal and state taxes.
On May 27, 2005, appellant and UJA (the "charities") filed a motion for an order holding that the QTIP trusts' estate tax obligation should be charged to Betty's shares alone and that they should receive their reasonable attorneys' fees and costs.[10] Betty countered with the certification of Alan S. Sussman, Esq., the Lee's attorney and the scrivener of the 1998 wills, and Alan Merker, a certified public accountant, and executor and trustee of the trusts created by Minerva.[11]
In his certification, Sussman "unequivocally state[d] that Minerva's intention with respect to the QTIP Trust, was to benefit her husband, Sam Lee, first; her daughter, Betty MacDonald, second; and the charities third." He further "unequivocally state[d] that Minerva intended the specific legacies to Betty and Betty's trust to be paid in full and that the amount passing to charity, if any, consist of the balance after the payment of any debts expenses and liabilities, including taxes." Similarly, Merker stated that "[t]here was no question in [his] mind that Minerva's intent was that the Trusts should benefit Betty MacDonald and her family." He explained:
Betty had become like a daughter to her. In fact, as one is well-aware, Minerva adopted Betty, a clear indication of her feelings. Betty was the daughter of her deceased twin sister. Betty was her companion in her later years. Minerva wanted to insure that should something happen to her, Betty would be there to help take care of Sam, a task which Betty did extremely well without later interference of others.
As for the charitable bequests in her will, Merker certified:
While Minerva was somewhat charitable in her life, she would often say to me, "I already gave them money. Why do they want more?" The charitable bequests in her Will, therefore, were an afterthought. While she wanted to give them something, she certainly did not want them to have the majority of the Trusts' interest. Those monies were to be reserved for her blood kin, Betty MacDonald and her children.
Thus, Merker "firmly believe[d] that Minerva Lee would not have wanted Betty MacDonald's share diminished by the taxes the charities seek to extract from her."
In a written opinion, dated April 5, 2005, following oral argument, the judge concluded that the trusts were required to account to the estate for the taxes.[12] The *641 court found that the express terms of the QTIP trusts established under Minerva's will directed the order and preference for the distribution of their assets. He noted that "Minerva's will clearly lays out that there are to be specific legatees which are to take place before distribution to the charitable institutions," and therefore found "no reason that the Charities are in fact entitled to any amount before distribution takes place." He thus concluded that "[t]axes assessable to the QTIP Trusts by virtue of [their] inclusion in Samuel's gross estate shall be paid out of the Trusts' corpus before distribution," with the remainder to then be "distributed in accordance with the terms of Article Fourth of Minerva's will." According to the judge:
Here, it is apparent to this court, both by the testamentary direction itself and the testimony provided in the certifications, that Minerva did in fact intend to provide for individual beneficiaries, and specifically that of her "child", her daughter Betty. Taxes assessable to the QTIP Trusts' by virtue of inclusion in Samuel's gross estate shall be paid out of the Trusts' corpus before distribution, the remainder shall then be distributed in accordance with the terms of Article Fourth of Minerva's Will.

II.
Appellant contends that the trial court erred by failing to find that the Internal Revenue Code ("I.R.C."), 26 U.S.C.A. § 2207A, and its implementing regulations, 26 C.F.R. § 20.2207A-1, "exonerate the charitable beneficiaries from the federal estate taxes attributable to the QTIP trusts." Specifically, appellant argues that "I.R.C. § 2207A and the Treasury Regulations govern the apportionment of the federal estate taxes among the QTIP trusts beneficiaries," thereby preempting any state law analysis of the predeceased spouse's intent. Appellant further argues that, under 26 C.F.R. § 20.2207A-1(a)(1), there is no right of recovery from the QTIP trusts of assets for which a charitable deduction was allowed.[13] Thus, appellant contends that the tax obligation for the QTIP trusts should be charged only against Betty and her family's share of the remainder.
In its written opinion, the court noted that "[g]enerally, state law controls the apportionment of federal and state tax liability," and "[i]n the absence of directions to the contrary, [N.J.S.A. 3B:24-4] apportions the estate tax pro rata among the beneficiaries." The court, however, recognized that QTIP trusts imposed "additional considerations concerning recovery with regard to federal estate taxes." Specifically, the court found that I.R.C. § 2207A(a)(1)(a) gave Samuel's estate "the right to recover federal estate taxes from the [QTIP trusts'] beneficiaries named by the pre-deceased spouse's will in order to pay estate taxes pursuant to the inclusion of a QTIP trust in a gross estate"; and by virtue of I.R.C. § 2207A(a)(1), "[t]he estate may seek to recover the amount by which the total estate tax paid exceeds the total tax payable that would have been payable if the value of the property had not been included in the gross estate." See 26 U.S.C.A. § 2207A(a)(1)-(2). Thus, although federal law exempted charitable beneficiaries of QTIP trusts from taxation, the court nonetheless concluded that absent any express provision in her will to the contrary, Minerva's intent controlled the appropriate distribution of the assets remaining in the QTIP trusts.
*642 The Internal Revenue Code, 26 U.S.C.A. § 2001(a), imposes a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States.[14] Generally, "Congress intended that the federal estate tax should be paid out of the estate as a whole and that the applicable state law as to the devolution of property at death should govern the distribution of the remainder and the ultimate impact of the federal tax. . . ." Riggs v. Del Drago, 317 U.S. 95, 97-98, 63 S.Ct. 109, 110-11, 87 L.Ed. 106, 110-11 (1942). Instead, so long as the federal estate taxes are paid, state law governs the distribution of the remainder of the estate and the "ultimate thrust of the tax." Ibid.[15] Therefore, absent congressional enactments to the contrary, state law governs the allocation of the tax burden. Ibid. However, where Congress has spoken, such as with the marital deduction, federal law controls. McAleer v. Jernigan, 804 F.2d 1231, 1233 (11th Cir.1986) ("in the absence of congressional enactments to the contrary, state law governs the allocation of the burden of taxes as to property that is part of the estate [but] where Congress has spoken . . . federal law governs").[16]
The Internal Revenue Code allows a marital deduction for the value of property transferred to a surviving spouse. 26 U.S.C.A. § 2056. The marital deduction permits a testator to provide for his or her spouse, up to the limits set forth in the federal statute, without incurring federal tax liability therefor. Gesner v. Roberts, 48 N.J. 379, 381, 225 A.2d 697 (1967).
The Economic Recovery Tax Act of 1981 extended the marital deduction to property in QTIP trusts. 26 U.S.C.A. § 2056(b)(7)(B). In re Will of Adair, 149 N.J. 591, 597-98, 695 A.2d 250 (1997). A QTIP trust provides the surviving spouse with "ongoing income support for the surviving spouse while retaining the corpus for the children or other beneficiaries." Ibid. The election of QTIP treatment, therefore, allows the decedent to control the property's ultimate disposition after the surviving spouse's death and obtain an estate tax benefit. Id. at 597, 695 A.2d 250; In re Estate of Branigan, 129 N.J. 324, 328, 609 A.2d 431 (1992).
26 U.S.C.A. § 2056(b)(7)(B)(i) defines QTIP property as property (1) that passes "from the decedent," (2) "in which the surviving spouse has a qualifying income interest for life," and (3) "to which an election" was made at the time of payment of the decedent's estate taxes. The value of the QTIP property that passes to the surviving spouse is deducted from the decedent's gross estate, and no estate taxes are paid on it upon the death of the first spouse. 26 U.S.C.A. § 2056(a); Adair, supra, 149 N.J. at 598, 695 A.2d 250. Such was the case here. As a result, the tax *643 owed on the QTIP property was deferred until the death of Samuel, the surviving spouse, at which time the QTIP property was included in his gross estate pursuant to 26 U.S.C.A. § 2044. See Adair, supra, 149 N.J. at 598, 695 A.2d 250.
Under 26 U.S.C.A. § 2207A(a)(1), if the surviving spouse's gross estate includes any QTIP property, the executor or administrator may recover the amount of estate tax attributable to the inclusion of that property from a "person receiving the property." Specifically, 26 U.S.C.A. § 2207A(a)(1) provides that the amount recoverable is the portion of the tax resulting from the inclusion of the QTIP in the gross estate, that is the amount by which the total estate tax exceeds the total estate tax that would have been payable if the QTIP had not been included. The right of recovery, however, does not apply if the decedent otherwise directs by will. 26 U.S.C.A. § 2207A(a)(2); see Adair, supra, 149 N.J. at 594-95, 695 A.2d 250 (holding that federal estate tax was not at issue where predeceased spouse's will directed his trustees to pay any federal taxes due on the QTIP trust from the trust principal before distributing the balance to decedent's children, but did not mention the payment of state death taxes).
However, a decedent waives the right of the estate to recover from the person receiving the QTIP property a portion of the estate tax attributable to its inclusion if the will "specifically indicates an intent to waive any right of recovery." 26 U.S.C.A. 2207A(a)(2).[17]
As the trial court observed, Samuel's 2003 will (prepared by a new scrivener) suggested that he wanted to waive the right of recovery. However, as the judge also recognized, the Settlement Agreement subsequently provided otherwise. Specifically, the interested parties all agreed that the QTIP trusts would pay Samuel's estate the federal and state taxes attributable to inclusion of the QTIP trusts in Samuel's gross estate. The court approved the Settlement Agreement, thereby conferring authority upon the executor and trustees to comply with its terms.
We agree with appellant that federal law controls the federal taxation of estates, and that the estate is not entitled to recover from the charitable beneficiaries their pro rata share of the federal estate taxes. The applicable Treasury regulation provides that "[t]here is no right of recovery from any person for the property received by that person for which a deduction was allowed from the gross estate if no tax is attributable to that property." 26 C.F.R. 20.2207A-1(a)(1). That regulation is consistent with congressional intent to provide a special rule for transfers of interests in property to a spouse and a qualifying charity for which there is no federal estate tax liability.
There can be no dispute that 26 U.S.C.A. § 2207A applies to the question before us, and preempts state law regarding the payment of federal estate taxes attributable to QTIP property. See Cleveland v. Compass Bank, 652 So.2d 1134, 1137-38 (Ala.1994) (holding 26 U.S.C.A. § 2207A preempted state law but made no specific provision for the apportionment of state estate taxes). Because 26 C.F.R. 20.2207A-1 implements the statute and excludes the right of recovery for property for which a deduction for estate tax purposes was allowed, the charitable beneficiaries *644 cannot be required to reimburse Samuel's estate for their proportionate share of the federal estate taxes attributable to the QTIP trusts. As the trial judge recognized, charitable bequests are "exempt from taxation since the estate will take a charitable deduction following the distribution of the property." As a result, the federal statute and regulation preempt state law with respect to the payment of federal estate taxes, and the charitable beneficiaries cannot be assessed their proportioned share for federal estate tax purposes.
We nevertheless affirm the judgment. While the trial court's analysis of probable intent may not have been relevant to the issue of federal estate taxation attributable to the charitable beneficiaries of the QTIP trusts, construction of a will is a matter of state law, and state law governs the allocation of the tax burden in the absence of congressional intent to the contrary. See Riggs, supra, 317 U.S. at 98-99, 63 S.Ct. 109; McAleer, supra, 804 F.2d at 1233; Cleveland, supra, 652 So.2d at 1137.
To that end, in interpreting a will, courts in this State endeavor to "ascertain the intent of the testator." In re Estate of Payne, 186 N.J. 324, 335, 895 A.2d 428 (2006). The doctrine of probable intent is long established in New Jersey's jurisprudence. In re Estate of Branigan, supra, 129 N.J. at 331, 609 A.2d 431.[18] As Justice Wallace has recently stated:
In interpreting a will, our aim is to ascertain the intent of the testator. "[W]hen we say we are determining the testator's intent, we mean his probable intent." Fidelity Union Trust Co. v. Robert, 36 N.J. 561, 564, 178 A.2d 185 (1962) (citation omitted). We continue to adhere to the view of the doctrine of probable intent expressed in Fidelity Union. In that case, the Court stated that in determining the testator's subjective intent, "courts will give primary emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances." Id. at 564-65, 178 A.2d 185. The trial court should "ascribe to the testator `those impulses which are common to human nature and . . . construe the will so as to effectuate those impulses.'" Id. at 565, 178 A.2d 185 (citation omitted). More recently, this Court emphasized that "[c]ourts are enjoined to `strain' toward effectuating the testator's probable intent `to accomplish what he would have done had he envisioned the present inquiry.'" In re Estate of Branigan, 129 N.J. 324, 332, 609 A.2d 431 (1992) (citation omitted).
The trial court is not "limited simply to searching out the probable meaning intended by the words and phrases in the will." Engle v. Siegel, 74 N.J. 287, 291, 377 A.2d 892 (1977). Extrinsic evidence may "furnish[] information regarding the circumstances surrounding the testator [and] should be admitted to aid in ascertaining [the testator's] probable intent under the will." Wilson v. Flowers, 58 N.J. 250, 260, 277 A.2d 199 (1971). To be sure, the testator's own expressions of his or her intent are highly relevant. Id. at 262-63, 277 A.2d 199. Once the evidence establishes the probable intent of the testator, "the court may not refuse to effectuate that intent by indulging in a merely literal reading of *645 the instrument." Id. at 260, 277 A.2d 199.
[In re Estate of Payne, 186 N.J. 324, 335, 895 A.2d 428 (2006).]
See also In re Estate of Ericson, 74 N.J. 300, 310, 377 A.2d 898 (1977) (considering impact of trial testimony of attorney who prepared the will in question and the trust officer to whom the testator expressed his wishes); Danelczyk v. Tynek, 260 N.J.Super. 426, 430-31, 616 A.2d 1311 (App.Div. 1992) (holding that the trial court properly admitted extrinsic evidence, including testimony of lawyer who drafted the will and the testator's close friend, to explain testator's will).
Here the charities present no contest to the certification of the testatrix's attorney and accountant who were deeply involved in Minerva's estate planning and family affairs at the time her will was executed. As the trial court noted, neither fiduciary appears to have a motive, "stake" or personal interest which might compel us to ignore their certifications. Further, appellant offers no contrary proofs or reason to disregard them.
The certifications of Sussman and Merkel provide adequate proof that Minerva intended to provide Betty and her trust with a specific legacy following Samuel's death, and that the specific legacies were to be fully satisfied, with all debts, expenses, and liabilities including taxes, paid before the charities received the balance. Such direct statements of intent by Minerva's scrivener and co-trustee were properly considered by the trial court, see In re Estate of Ericson, supra, 74 N.J. at 310, 377 A.2d 898; Wilson, supra, 58 N.J. at 263-64, 277 A.2d 199, and are consistent with a mother's natural inclination to provide for her children and grandchildren. See In re Estate of Ericson, supra, 74 N.J. at 306, 377 A.2d 898.[19]
As noted, the trial judge thoroughly detailed Minerva's intent by reference to the certifications of her attorney-scrivener and her accountant, the latter of whom was an executor and trustee under her will. The attorney "met and spoke with Minerva on numerous occasions between 1992 and her death in 1999 to discuss various issues related to her estate plan." He certified that the charities were to receive the balance of the estate only after the specific legacies to Betty and her trust were "paid in full" and the "debts, expenses and liabilities, including taxes" were paid. Similarly, her accountant Merker certified that Betty considered the charities as "an afterthought," because her "monies were to be reserved for her blood kin, Betty MacDonald and her children."[20]
We interpret the trial judge's opinion to require modification of Minerva's will to provide the charities with a lesser share of the residuary estate if federal estate taxes could not include apportionment of their share. Stated differently, the record demonstrates that, as a matter of the testatrix's *646 probable intent, Betty MacDonald and her family would have received a greater share of the estate (whether or not their legacies were part of the residuary estate) if federal estate taxes were to be paid exclusively from their shares. Consistent with the well-established doctrine of "probable intent," see In re Estate of Branigan, supra, 129 N.J. at 336, 609 A.2d 431, permitting reformation of a will ("to modify the existing provision of [QTIP] trust funds in order to derive maximum benefits under the federal estate tax laws"); In re Estate of Ericson, supra, 74 N.J. at 310, 377 A.2d 898 (construing will to maximize marital deduction and minimize estate taxation), we affirm the judgment regarding federal estate taxation based upon a construction of the will which modifies the residuary estate to provide a greater bequest to Betty MacDonald and her family in order to provide for payment of the federal estate tax liability or for the recovery of federal taxes attributable to the QTIP trusts.

III.
Appellant contends that the trial court also erred by failing to exonerate the charitable beneficiaries of the QTIP trusts from the apportionment of New Jersey estate taxes. See N.J.S.A. 54:38-1 to -16.[21] Essentially, the appellant argues that the court erred in applying the doctrine of probable intent to the construction of Minerva's will and in concluding from the testamentary document itself and extrinsic evidence that Minerva intended first to create a specific legacy for Betty and her family, and then to leave the residuary to the charitable beneficiaries after the payment of taxes. We have already noted that the Sussman and Merker certifications provided uncontested proof which was sufficient to demonstrate Minerva's testamentary intent and that appellant did not provide enough to warrant an evidentiary contest on that issue. See Brill v. Guardian Life Ins. Co., 142 N.J. 520, 532, 666 A.2d 146 (1995). See also, e.g., In re Estate of Ericson, supra, 74 N.J. at 309-10, 377 A.2d 898; Danelczyk, supra, 260 N.J.Super. at 431-32, 616 A.2d 1311 (construing intent based on extrinsic evidence of attorney who drafted will).
Appellant nevertheless argues that New Jersey law exonerates charitable beneficiaries from state taxation in order to maximize the tax advantage for the estate. It relies on In re Estate of Rankin, 169 N.J.Super. 317, 326-28, 404 A.2d 1200 (App.Div.1979), in which we held that a charitable beneficiary did not have to contribute its share of the residuary estate to the payment of federal estate taxes and New Jersey transfer inheritance taxes. Among other things, we found that "where a will is silent," and there was no extrinsic evidence of contrary intent, "public policy suggests that a gift which, because deductible, lessens taxes on the estate as a whole, should not be made to bear any part of the tax attributable to other tax generating parts of the estate." Id. at 327, 404 A.2d 1200. We further found that this policy was consistent with the presumption under New Jersey law that a testator intended the maximum tax advantage for his estate. Ibid. However, as the trial judge here noted, we also expressly stated that we would indulge that equity "only in the *647 absence of contrary testamentary intent derived from the will or from extrinsic evidence of it." Id. at 328, 404 A.2d 1200. Because both Minerva's will and the certifications refute the presumption that Minerva intended the maximum tax advantage for her estate at the expense of her family, the charitable beneficiaries cannot be exonerated from paying their share of the New Jersey tax.
Accordingly, we affirm, substantially for the reasons stated by the trial judge and the reasons given by us to sustain the judgment regarding apportionment of federal estate taxes, the judgment regarding the New Jersey state tax as well.
Affirmed as to state taxes and modified as to rationale with respect to federal taxes, and remanded for further proceedings consistent with this opinion.
NOTES
[1] The August 26, 2005 order incorporated a settlement agreement of March 28, 2005 and a "Final Judgment" of May 16, 2005. We use the term "appellant" for the trustees of Stevens Institute to avoid any confusion with the trustees under the will of Minerva Lee.
[2] These uncontested facts are embodied in the certification of Alan S. Sussman, Esq. who represented Minerva and Samuel, and who prepared their wills and codicils as well as the papers incident to Betty's adoption.
[3] Sam executed his Last Will and Testament on the same day.
[4] Article Twelfth provided:

The Spouse's Part shall be equal in value to the maximum marital deduction allowable to my estate under federal estate tax law. Notwithstanding the foregoing, if after the allocation to the Spouse's Part as above provided, the federal estate tax imposed with respect to my estate would be less than the amount of available or allowable "credits" as hereinafter defined, then the Spouse's Part shall be reduced, and the Family Part correspondingly increased, by such amount of property as would produce a federal estate tax equal (or as nearly equal as practicable) to such credits, so that, in all events, the Family Part will consist of the largest amount of property possible without the imposition of any federal estate tax. For the purposes of this definition, if the use of all credits against federal gift and estate taxes available to my estate would increase the amount of any tax payable to any state on account of my death, then I direct that such credits be used only to the extent they do not increase such state death taxes.
The term "credits" shall mean the aggregate amount of all credits available or allowable to my estate tax, credit for state death taxes, credit for gift taxes, credit for taxes on prior transfers and credit for foreign death taxes.
[5] The trial judge seems to conclude that only the third paragraph of Article Fourth constituted the residuary estate to be distributed if any estate remains following payment of the specific legacies to Betty and her family.
[6] A gross estate includes the value of "all property, real or personal, tangible or intangible," at the time of a decedent's death. 26 U.S.C.A. § 2031(a).
[7] The parties refer to the Internal Revenue Code as "I.R.C.," and we refer thereto and to Title 26 of U.S.C.A. interchangeably.
[8] Because several pages of Samuel's 2003 will are illegible, that statement is taken from the court's opinion. In any event, the provisions of the 2003 will are not in dispute or relevant, in light of the settlement following Betty's caveat which was based on claims of undue influence and lack of testamentary capacity.
[9] The executors, trustees and beneficiaries under Samuel's 1998 will were parties to the settlement. The settlement agreement addressed specifically identified issues "regarding the QTIP Trusts' obligation to pay federal and New Jersey estate taxes attributable to inclusion of the QTIP Trusts in Samuel's gross estate for federal estate tax purposes" and how taxes were to "be charged against the interests of the remainder of the beneficiaries of the QTIP Trusts" and how "the QTIP Trusts and Family Part Trust remaining at Samuel's death, after the payment by the QTIP Trusts of those federal and New Jersey estate taxes, shall be distributed among the remainder beneficiaries of those trusts. . . ." There is no issue raised concerning the assessment or amount of the taxes.
[10] As of June 22, 2005, the balance of the QTIP trusts was $1,147,725 and the balance of the Family Trust was $213,495. The Family Part Trust was not taxable at Minerva's or Samuel's death. According to the probate judge, under the terms of the Settlement Agreement, the QTIP trusts were to contribute "approximately $550,000" to Samuel's estate, thereby leaving approximately $597,725 in the QTIP trusts and $213,495 in the Family Part Trust. The probate judge "presume[d]," without dispute, that the $550,000 "included . . . the estate taxes for which the QTIP Trusts are liable."
[11] No issue is raised before us by virtue of the fact Merker and Betty MacDonald witnessed Minerva's will and codicil.
[12] The court noted that if the charities "were granted an exemption from the taxes being assessed against their share of the distribution from the QTIP trusts[,] the cumulative distribution to Betty and her family would be reduced from $765,000.00 to $215,000.00, while the Charities' distribution would be raised from approximately $46,220.00 to $596,220.00, a nearly thirteen-fold increase."
[13] The regulation provides, in part, that "[t]here is no right of recovery from any person for the property received by that person for which a deduction was allowed from the gross estate if no tax is attributable to that property."
[14] The parties do not dispute the controlling statute and regulations or argue that different dates control their application. We employ the cited statute and regulations for purposes of this opinion. However, while the trial court and parties refer to the Internal Revenue Code ("I.R.C."), we refer thereto and to Title 26 of the United States Code interchangeably.
[15] As the trial judge noted, in New Jersey, N.J.S.A. 3B:24-4 controls the apportionment of federal and state tax liability. That statute provides in relevant part, that "[i]n the absence of directions to the contrary," the estate tax must be apportioned pro rata among the beneficiaries. N.J.S.A. 3B:24-4(a). We find that statute is not dispositive with respect to federal estate taxation of QTIP trusts because federal law controls that subject.
[16] In McAleer, because "Congress [had] spoken" on the subject, the IRC controlled the allocation of taxes for the portion of the estate tax attributable to the inclusion of life insurance proceeds in the gross estate.
[17] As already noted, the parties do not contest or dispute the statutes or regulations which control the disposition of the case or point to any dispositive amendments between the dates of the death of either Minerva or Samuel. See footnote 14. There is no challenge to the federal regulation, and there could be none in this forum.
[18] The statute governing a testator's intention at the time the 1998 wills were executed was codified in N.J.S.A. 3B:3-33.
[19] Appellant contends that the court's reliance on the certifications was improper because they did not meet the "clear and convincing" standard of proof required by New Jersey's Dead Man Statute, N.J.S.A. 2A:81-2. The trial court concluded that the statute did not apply, but even if it did, the court found that the "clear and convincing" standard of proof was met.
[20] Appellant points to a provision in Article Fourth of Minerva's will, stating that the university is to use the income derived from her gift "to provide scholarships to no fewer than five (5) students each year" as evidencing an intent to give more than one-half of the balance left to Stevens. However, the reference is not to full scholarships, and given the lack of contest by the charities to the certifications of Merker and Sussman, there can be no reasonable dispute as to Minerva's intent, and thus no need for an evidentiary hearing.
[21] See generally, Subtitle 5 (chapters 33-37) of Title 54 relating to Transfer Inheritance and Estate Taxes. While this case involves no issue regarding the assessment or amount of estate taxes, see Oberhand v. Director, Div. of Taxation, 22 N.J.Tax 55 (2005), rev'd 388 N.J.Super. 239, 907 A.2d 428 (App.Div.2006), for a thorough discussion of the relationship between federal and state estate taxes and the retroactive impact of amendments to state law in light of amendments to federal law.