895 A.2d 428

IN THE MATTER OF THE ESTATE OF THEODORE M. PAYNE, DECEASED.

Argued January 4, 2006—Decided April 20, 2006.

*Dennis T. Smith,* argued the cause for appellant, Donald P. Burton (*Pashman Stein,* attorneys; *Michael S. Stein,* of counsel; *Mr. Smith* and *Mr. Stein,* on the briefs).

*John P. Beyel,* argued the cause for respondent Daulton J. Lewis, Executor of the Estate of Theodore M. Payne, Deceased (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys).

*Neal M. Frank,* argued the cause for respondent Frederick P. Wohlfarth.

Justice WALLACE delivered the opinion of the Court.

In this will contest, decedent had executed a will with a specific provision for his estate to pay to the joint tenant of a property he owned in Maine an amount equivalent to the mortgage debts on that property. Other than the "payment of all my just debts" clause, the will did not have a provision for the estate to pay the mortgage debts on decedent's home in New Jersey. Decedent bequeathed his New Jersey property to his partner, who lived with him in that residence. The trial court concluded that decedent's partner and not the estate was responsible for payment of the mortgage debts on the New Jersey property. The Appellate Division affirmed. We conclude that application of the doctrine of probable intent demonstrates that decedent intended to bequeath the New Jersey property to his partner debt-free. We reverse.

I.

Decedent Ted Payne met Don Burton in 1997. Both men were suffering from AIDS. By May 1997, they began living together at Payne's residence in Morristown. At that time, Payne was a

Managing Director of Finance at Metropolitan Life, and Burton was disabled.

Payne had previously acquired a vacation home in Harpswell, Maine. He purchased the property jointly with Frederick "Rick" Wohlfarth with the right of survivorship. Payne and Wohlfarth previously had lived together as partners but at the time they purchased the property their relationship had ended. They remained friends and agreed that the first to die would satisfy the balance of the mortgages on the property and that each would provide for that in his will.

Payne and Wohlfarth exchanged drafts of their wills to ensure the language concerning the payment of the mortgage debts on the Maine property would be similar. In his March 13, 1998, will, Payne bequeathed to Wohlfarth his half interest in the Maine property and a sum equal to the amount necessary to pay off the mortgage debts on the Maine property reduced by the proceeds of any life insurance policy on Payne's life payable to Wohlfarth. Payne also bequeathed the personal property located in Morristown to Wohlfarth and divided the residue among nieces, nephews, godchildren, charities, and educational institutions. The March 13, 1998, will made no provision for Burton.

In July 1998, Payne sold the Morristown residence and purchased a home in Harding Township, New Jersey. Burton resided in the home with Payne. According to Burton, while traveling to Maine in the summer of 1999 or 2000, he and Payne discussed the care of Payne's two dogs upon Payne's death. Burton expressed concern about his ability to provide a home for himself and the dogs on his limited income. He claimed that Payne told him not to worry because he would leave the house to him and that his life insurance proceeds would pay off the mortgage on the house. Burton also maintained that a similar conversation took place on another trip to Maine during the summer of 2000. At that time, Payne allegedly again stated that Burton would inherit the New Jersey property debt-free.

At some point, Payne contacted his attorney, Jack Wolff, to change his 1998 will. On August 15, 2000, Wolff mailed to Payne a revised draft. The primary change in the will provided for the gift to Burton of Payne's personal property located in the New Jersey home.

Payne reviewed the draft of the will and on November 16, 2000, wrote to Wolff outlining several other changes. Payne specified that there was a second mortgage on the Maine property and that his estate should pay that mortgage. In addition, he noted that the address of the New Jersey real estate should be listed as Harding Township and not Morristown. Wolff made the corrections in the will and forwarded another draft to Payne on November 21, 2000.

Payne's deteriorating health forced him to leave his position with Metropolitan Life in September 2001. It became necessary for Burton to assist Payne with his hygiene needs, the preparation of meals, transportation to and from his medical appointments, and the care of his dogs.

Payne still had not executed his revised will. On October 1, 2001, he wrote to Wolff explaining that the will appeared to give only the contents of the house to Burton, but his intent was to give the house and the contents to Burton. Payne also inquired whether he should retain the reference to the Maine property in the will because a friend informed him that it would pass automatically to the surviving owner and that inclusion in the will might cause adverse tax consequences.

Wolff made the changes and on October 15, 2001, forwarded a revised draft to Payne. The draft deleted the reference to a gift of the Maine property to Wohlfarth. Wolff also expressed his desire to review the deed to the Maine property to confirm that title was taken jointly with the right of survivorship. He also noted the possibility of federal estate tax consequences even though the Maine property would pass outside of the will.

Payne reviewed the latest draft of the will with Burton, who expressed several concerns. Burton believed the description of him as a "friend" failed to accurately describe their relationship. They agreed that the will should refer to Burton as Payne's "partner." Burton also questioned why the will provided for the payment of the mortgage on the Maine property but lacked similar language concerning the New Jersey property. Payne responded that it was necessary to provide expressly for payment of the mortgage debts on the Maine property because it was jointly owned property, and that the clause in his will directing payment of all his just debts provided for the debt on the New Jersey property.

Following that discussion, Payne wrote Wolff on November 11, 2001, instructing him to refer to Burton as his "partner" instead of as his "friend." He enclosed a copy of the Maine deed to verify that the property was held as joint tenants with the right of survivorship with Wohlfarth. Payne requested that Wolff prepare a Power of Attorney and Medical Directive in favor of Burton and asked for guidance concerning the tax and financial aspects of planning his estate due to its complexity. The crucial language in the November 11, 2001, letter provided that

[a]s may be evident from my will, I want the debt encumbering my real estate liquidated by whatever means so that it passes *to the beneficiaries free and clear* and I don't want it to be necessary for the *properties* to be sold in order to satisfy the debt, which, I assume, would come due upon my death. Providing for the mortgage financing on the house in Maine has been a prominent issue with Oakey Point, which Mr. Wohlfarth and I may resolve by using credit life insurance in a refinancing which we are presently contemplating.

At present, the major source of cash to the estate would come from life insurance proceeds of about $1 million and I have *viewed this cash as available to be directed to pay off the mortgage balances which may exist at the time.* However, this might not be true if estate taxes are assessed on the *gross value of the real estate, which is currently worth between $1.7 million and $2.2 million, and there is a big tax liability to satisfy ahead of addressing the mortgages.* There is another $300,000–$400,000 (assuming the stock market is bottoming out) of investments which would be available to the estate to pay taxes and debt.

It has been suggested that I structure the life insurance proceeds to be paid into a trust outside of the estate where the trust would be directed to use the proceeds to repay the real estate debt. I am not inclined to create another level of complexity such as this unless it is necessary.

Maybe we can sort through some of these issues when I come in to sign the will and other documents.

[(emphasis added).]

After receiving that letter, the sole change Wolff made in the will was to designate Burton as "partner." On March 4, 2002, Wolff wrote to Payne enclosing the revised will, power of attorney, and living will.

Wolff arranged to have Payne execute the documents in his office on March 14, 2002. Unfortunately, Payne was hospitalized on March 13, 2002. The following day Burton telephoned Wolff, informed him of Payne's hospitalization, and requested that Wolff deliver the original documents to the hospital for Payne to execute. Wolff went to the hospital and spoke to Payne in the Intensive Care Unit. After asking Payne several questions, Wolff was satisfied that Payne was lucid and wanted to execute the will and related documents. Payne then signed the will, power of attorney and living will.

The next day Payne lapsed into a coma and remained in that condition until his death on April 21, 2002. Daulton Lewis was named executor of the will. Lewis informed Burton that he was responsible for paying the outstanding debt on the New Jersey property. Burton replied that Payne wanted any mortgages on the house satisfied from his estate and intended that the property would pass to him debt-free.

At the time of Payne's death, the approximate value of his real estate was $900,000 for the New Jersey property and $375,000 for his one-half interest in the Maine property. The New Jersey property was encumbered by a mortgage in the amount of $347,190 and a line of credit of $92,458, and the Maine property was encumbered by a mortgage of $302,450 and a second mortgage of $106,092. The estate ultimately received life insurance proceeds totaling $1,053,425. Payne's estate satisfied the obligations on the Maine property but refused to pay the debt on the New Jersey property because it was bequeathed to a named beneficiary.

Burton filed a complaint against the estate. He alleged that at the time of Payne's death, he had been living with Payne as his partner for approximately four years, that Payne informed him that he would inherit the New Jersey property debt-free, and that the November 11, 2001, letter from Payne to Wolff expressed that intent. Answers were filed by the executor and various other beneficiaries. At the bench trial, Burton testified that his relationship with Payne was like a marriage in every way. He outlined three conversations he had with Payne in which Payne expressed his desire to give Burton the New Jersey property debt-free.

Wolff, who had drafted the will, testified that Payne instructed him to provide for the estate to pay the balance of the mortgages on the Maine property but had not instructed him to do the same for the mortgage debts on the New Jersey property. Wolff acknowledged that he had neither discussed with Payne the difference in treatment of the two properties nor estate tax issues. When he received the November 11, 2001, letter, Wolff did not interpret the letter to mean that Payne wanted the mortgage debts on the New Jersey property satisfied out of his estate. It was Wolff's belief that except for changing the description of Burton from "friend" to "partner," the will was satisfactory to Payne. On cross-examination, Wolff explained that despite the reference in the November 11, 2001, letter that Payne wanted the mortgage debts encumbering the real estate paid off so "it passes to my beneficiaries free and clear," he believed Payne was only referring to the Maine property. Wolff admitted that following the November 11, 2001, letter, he never met with Payne to sort through some of the issues raised in the letter and never discussed with Payne whether his use of the word "properties" was a mistake.

Lewis, the executor of the estate, testified that he was a long-time friend of Payne, and that Payne was the godfather to his daughter. He said that his daughter was one of numerous beneficiaries under the residuary clause of Payne's will. It was

not until after Payne's death that he became aware that Payne had named him executor. Lewis, who was a lawyer, said that Wohlfarth was one of his clients. Lewis recalled a conversation with Payne and Wohlfarth wherein they discussed a testamentary plan in which the first to die would pay off the mortgage debts on the Maine property.

Wohlfarth testified that he had both a personal and a business relationship with Payne. Even after their close personal relationship ended, he said they continued to maintain a business relationship. In 1997, the two of them purchased the Maine property jointly, each contributing to the purchase price and being obligated on the mortgage. Wohlfarth stated that Lewis was his attorney and had drafted his will. Following a discussion with Lewis, it was Wohlfarth's understanding that "at some point the money in the estate would be disbursed to pay off the various mortgages." He had agreed with Payne that the first to die would pay off the mortgage debts on the Maine property either through the estate or with life insurance proceeds. He and Payne had exchanged wills and both had a similar clause about paying off the mortgage debts on the Maine property.

The trial court found that the November 11, 2001, letter was evidence of Payne's desire to find a way that Burton would be protected from the mortgage payments. However, the court concluded that Payne was looking in other directions for that help and never expressed an intent that other beneficiaries be saddled with the expense of having the estate satisfy the mortgage. The court rejected the "all my just debts" clause of the will as evidencing Payne's intention to cover the mortgage debts on the real estate because he "had a detailed disposition with respect to the [Maine] property owned by decedent and Wohlfarth." The court reasoned that it would not be necessary to specifically provide for the debt on the Maine property if "the all my debts clause could just have easily covered the same item with respect to the Maine property." Additionally, the court held that Payne's alleged intention to have the "all my just debts" clause apply to

the mortgage debts for both properties was inconsistent with Wolff's testimony that Payne was detail oriented in their dealings. The court concluded that Burton failed to meet the burden of establishing that Payne intended to give him the New Jersey property debt-free.

The Appellate Division affirmed in an unpublished opinion. The panel found that the trial court properly applied the doctrine of probable intent "by attempting to accomplish what the testator would have done if confronted with the issues." The panel concluded that the trial court "essentially found that although Payne would have liked to provide Burton with the property debt-free, he was unable to do so in light of the priority he attached to the Maine property and the lack of sufficient residual assets remaining in the estate to accomplish his other bequests."

We granted Burton's petition for certification. 185 *N.J.* 35, 878 *A.*2d 852 (2005).

## II.

Burton contends that the trial court failed to properly apply the doctrine of probable intent in interpreting the will. Specifically, Burton argues that the court failed to consider that the common human impulse is to make appropriate provisions for one's spouse and that same sex couples are entitled to that reasonable inference. Further, Burton claims the trial court applied the incorrect standard of proof.

The executor of the estate disagrees. He argues that the controlling statute, *N.J.S.A.* 3B:25–1, makes the doctrine of probable intent inapplicable to this case, and that in any event, the evidence did not establish Payne's probable intent to pass the New Jersey property to Burton free and clear of debt.

Wohlfarth adds that the doctrine of probable intent should not apply in this case because the will was clear and unambiguous. Further, he argues that the common human impulse to provide appropriate care for one's spouse is not a relevant consideration.

## III.

In interpreting a will, our aim is to ascertain the intent of the testator. "[W]hen we say we are determining the testator's intent, we mean his probable intent." *Fidelity Union Trust Co. v. Robert*, 36 *N.J.* 561, 564, 178 *A.*2d 185 (1962) (citation omitted). We continue to adhere to the view of the doctrine of probable intent expressed in *Fidelity Union*. In that case, the Court stated that in determining the testator's subjective intent, "courts will give primary emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances." *Id.* at 564–65, 178 *A.*2d 185. The trial court should "ascribe to the testator 'those impulses which are common to human nature and ... construe the will so as to effectuate those impulses.'" *Id.* at 565, 178 *A.*2d 185 (citation omitted). More recently, this Court emphasized that "[c]ourts are enjoined to 'strain' toward effectuating the testator's probable intent 'to accomplish what he would have done had he envisioned the present inquiry.'" *In re Estate of Branigan*, 129 *N.J.* 324, 332, 609 *A.*2d 431 (1992) (citation omitted).

The trial court is not "limited simply to searching out the probable meaning intended by the words and phrases in the will." *Engle v. Siegel*, 74 *N.J.* 287, 291, 377 *A.*2d 892 (1977). Extrinsic evidence may "furnish[ ] information regarding the circumstances surrounding the testator [and] should be admitted to aid in ascertaining [the testator's] probable intent under the will." *Wilson v. Flowers*, 58 *N.J.* 250, 260, 277 *A.*2d 199 (1971). To be sure, the testator's own expressions of his or her intent are highly relevant. *Id.* at 262–63, 277 *A.*2d 199. Once the evidence establishes the probable intent of the testator, "the court may not refuse to effectuate that intent by indulging in a merely literal reading of the instrument." *Id.* at 260, 277 *A.*2d 199.

We note also, that at the time of Payne's death, *N.J.S.A.* 3B:25–1 provided that "unless the Will of the testator shall expressly or impliedly direct that the mortgage interest be otherwise paid," the

property passing to a devisee "shall be primarily liable for the mortgage debt." Effective 2004, the Legislature amended *N.J.S.A.* 3B:25–1 to make it clear that a "general direction in the will to pay debts shall not be deemed a direction to pay the mortgage or security interest." *L.* 2004, *c.* 132, § 88. Prior to that amendment, the Appellate Division noted that a direction in the will to pay " 'just debts' does not clearly indicate that the outstanding mortgage is included in the executor's responsibilities." *In re Estate of Zahn,* 305 *N.J.Super.* 260, 270–71, 702 *A.*2d 482 (App.Div.1997).

■ With this background, we turn now to review the evidence to ascertain Payne's probable intent. The most important evidence of Payne's probable intent is set forth in his November 11, 2001, letter to his attorney. Before discussing that letter, we restate the pertinent circumstances surrounding Payne's revisions of his will.

Payne had reviewed and made changes on several drafts of his will. Each draft contained a direction to pay off his just debts and an express provision to pay to Wohlfarth an amount equivalent to the debt on the Maine property. It is uncontested that Payne and Wohlfarth had equally contributed to purchasing and maintaining the Maine property and both had executed the Maine mortgages. Payne had agreed with Wohlfarth that the first to die would pay off any mortgage debts on the Maine property even though the surviving owner was still obligated on those debts.

It is reasonable to infer that Payne believed that upon his death, unless he made a special provision in his will, his estate would be responsible only for his one-half share of the mortgage debts on the Maine property. Thus, a specific bequest in the will to pay off the entirety of the mortgage debts on the Maine property was necessary to effectuate the desire of Payne and Wohlfarth.

The crucial document in determining Payne's intent is his November 11, 2001, letter. The first paragraph of the letter expressed satisfaction with the will, except that Payne wanted

Burton identified as his "partner." The fifth and sixth paragraphs clearly evidence Payne's probable intent and are consistent with an intention that the "all my just debts" clause was a direction for the estate to pay the mortgage debts on the New Jersey property. Payne stated

[a]s may be evident from my will, I want the debt encumbering my real estate liquidated by whatever means so that it passes to the beneficiaries free and clear and I don't want it to be necessary for the properties to be sold in order to satisfy the debt, which, I assume, would come due upon my death.

That sentence is a clear and unambiguous expression of Payne's intentions that his beneficiaries, Burton and Wohlfarth, receive their respective real estate debt-free and that neither beneficiary be required to sell the property to pay off the mortgages. Payne's use of the plural for "beneficiaries" and for "properties" evidences that he was referring to both Wolfarth and Burton and the Maine and the New Jersey properties. Moreover, the interpretation that Payne intended the "all my just debts" clause in his will to satisfy the mortgage debts on the New Jersey property is consistent with the opening phrase in his letter that "as may be evident from my will." That is, it was only "evident" from his will that the property would pass to his beneficiary free and clear if the just debts clause required his estate to pay the mortgage debts on the New Jersey property.

After expressing his desire that payment of the mortgage debts on the Maine property was "a prominent issue," Payne stated that the $1 million in life insurance proceeds was available to pay off the mortgage balances. He recognized, however, that "this might not be true if estate taxes are assessed on the gross value of the real estate, which is currently worth between $1.7 million and $2.2 million and there is a big tax liability to satisfy ahead of addressing the mortgages." The estimated values that Payne listed for his real estate is further proof that he was discussing all of his real estate because if he were referring only to the Maine property the value of the real estate would have been substantially less than $1 million, i.e. $375,000.

In short, the November 11, 2001, letter demonstrated that Payne intended his real estate to pass to his "beneficiaries free and clear" and that the "properties" should not have to be sold to pay off "the mortgage balances." The use of the plural form in those several instances evinces Payne's intention to pass both the New Jersey property and the Maine property to his beneficiaries, Burton and Wohlfarth, free and clear of mortgage debts.

We conclude that Payne's probable intent was to give the New Jersey property to Burton free and clear of mortgage debts.

## IV.

The reasoning that persuades us to find in favor of Burton on the New Jersey property and to interpret the "just debts clause" to require the estate to pay off the mortgage debts on the New Jersey property also supports our conclusion that Payne's probable intent was to pay off the mortgage debts on the Maine property first and then to pay off the mortgage debts on the New Jersey property. In his November 11, 2001, letter, Payne reinforced that position by stating that payment of the mortgage debts on the Maine property "has been a prominent issue." Further, Payne provided for the payment of the mortgages on the Maine property in his March 13, 1998, will, and he never wavered in that regard. At all times, Payne expressed his intent to pay off the mortgage debts on the Maine property by a specific bequest to Wohlfarth.

We conclude that if Payne were faced with the question of priority as between payment of the mortgage debts on the Maine property and the mortgage debts on the New Jersey property, his probable intent would be to pay the Maine debts first. *See N.J.S.A.* 3B:23–14 ("[s]hares of the distributees abate as may be found necessary to give effect to the intention of the testator.")

## V.

The judgment of the Appellate Division is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, dissenting.

In this case, the testator held ownership interests in two homes in different states. More importantly, the nature of testator's ownership in those two properties was different: he owned his vacation home in Maine in joint ownership with another, which joint ownership had a right of survivorship, while he alone owned his primary New Jersey home. The testator's will reflected this dichotomy: although it specifically provided that, as part of his estate, the mortgages on the Maine home were to be satisfied out of his estate, there was no parallel provision made for any mortgages that may have encumbered his New Jersey home.

In the face of clearly dissimilar treatment by the testator of his two separate real property holdings, the majority holds that both the trial court and the Appellate Division erred in determining this testator's probable intent and that, instead, the "application of the doctrine of probable intent demonstrates that decedent intended to bequeath the New Jersey property to his partner debt-free." *Ante*, 186 *N.J.* at 327, 895 *A.2d* at 429–30 (2006). I cannot agree.

The only credible proofs tendered that the testator's will did not represent fairly the testator's intent consisted of extrinsic evidence in the form of a letter from the testator to his counsel that preceded the testator's execution of the will by several months.[1] Unlike the majority's expansive application of extrinsic evidence in order to divine the testator's probable intent, caution mandates that we hew closely to the limits we have placed on the use of extrinsic evidence as a barometer of a testator's probable intent. As we made clear in *Wilson v. Flowers*, 58 *N.J.* 250, 263, 277 *A.2d* 199 (1971):

[I]n deciding whether there is an ambiguity, a court should always admit extrinsic evidence including direct statements of intent since experience teaches that lan-

---

[1] The only other evidence tendered concerning the purported ambiguity consisted solely of the devisee's claim of oral promises allegedly made by the testator to the effect that the devisee would receive the New Jersey home free and clear of all debts. Neither the trial court, nor the Appellate Division, nor the majority, nor I credit those allegations.

guage is so poor an instrument for communication or expression that ordinarily all such evidence must be examined before a court can be satisfied of whether an ambiguity exists. We do not, of course, mean to imply that such evidence can be used to vary the terms of the will, but rather that it should be admitted first to show if there is an ambiguity and second, if one exists, to shed light on the testator's actual intent.

[(citation omitted.)]

Held side-by-side, there is no ambiguity in the explicit terms of the will generated by that letter. The testator simply does not state in that letter what the majority holds here, that it was the testator's intent that his New Jersey home pass unencumbered to his devisee. On the contrary, it is the letter that is ambiguous while the will itself is patently clear: the mortgages on the Maine vacation home were to be satisfied from the estate, while no such provision was made in respect of the New Jersey home.[2]

In these circumstances, I would be guided by the deference for the trial court's findings properly accorded to them by the Appellate Division. Therefore, I would affirm for substantially the reasons thoughtfully expressed by both the trial court and the panel here.

I respectfully dissent.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*For affirmance*—Justice RIVERA–SOTO—1.

---

[2] The majority correctly notes that, in the absence of a specific testamentary direction that property is to pass to a devisee free and clear of any debts, the devise is "as is," that is to say, it passes to the devisee subject to whatever encumbrances it may have at the time of passing. *Ante,* 186 *N.J.* at 335–36, 895 A.2d at 434 (2006).