**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0011-21

IN THE MATTER OF
FRANCESCO VENTRE,
deceased.

_____

Submitted May 31, 2022 – Decided July 8, 2022

Before Judges Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. P-000390-20.

Connell Foley, LLP, attorneys for appellant Anthony Ventre, Executor of the Estate of Francesco Ventre (Anthony J. LaPorta, on the briefs).

Carmela Ventre, respondent pro se.

Louis J. Lamatina, attorney for respondent Carol Ventre.

PER CURIAM

In this will dispute, Anthony Ventre, the executor of his late father Francesco Ventre's estate, appeals from the Chancery judge's July 21, 2021 final judgment that declared that the decedent's will directed that a debt owed to

Francesco[1] by Anthony and his spouse, Carol Ventre, be forgiven and that the mortgage securing the debt be discharged. According to Anthony, the judge erred when he found that his father intended that the loan be forgiven as to both Anthony and Carol. According to Anthony, his father intended that Carol pay her husband the debt they both owed to Francesco.

On appeal, Anthony argues that the judge's determination was contrary to the evidence adduced at trial, it was based upon a misapplication of the doctrine of probable intent, and in reaching his conclusion, the Chancery judge "erred in excluding evidence of conversations Francesco had with his attorney and daughter," Carmela Ventre, after signing the subject will.

We have considered Anthony's contentions in light of the record and the applicable principles of law. We affirm as we conclude the judge's findings were supported by substantial credible evidence, there was no misapplication of the law, and the judge's evidentiary ruling was not an abuse of discretion.

## I.

The salient facts taken from the record are summarized as follows. This litigation arose as a result of a dispute between Anthony and Carol during their

---

[1] We refer to the family members by their first names for clarity and to avoid any confusion caused by their common last name.

A-0011-21

divorce litigation. In their divorce, Carol essentially took the position that under Francesco's will, a debt owed by her and Anthony to his father had been forgiven. As noted, according to Anthony, his father intended to only relieve Anthony of the debt, not Carol. Because the parties could not agree, Anthony sought a determination from the Chancery judge as to the meaning of the provision in Francesco's will that addressed the debt.

At the time of his death, Francesco had been married to his wife, the late Annunziata Ventre, Anthony's and Carmela's mother, for almost sixty years. During his lifetime, Francesco operated a construction company. His wife worked at a factory for many years. They used their joint funds to finance projects that Francesco developed.

Anthony worked in his father's business for almost fifty years. Part of his function was to assist his father in understanding legal documents and other materials as Francesco was not fluent in reading or understanding English.

After marrying Carol, Anthony developed his only sole project using funds lent to him by his father. Specifically, in 2002, Anthony used funds he borrowed from his father to purchase a property in Ridgefield, upon which Anthony intended to construct and then sell a two-family house. Towards that

3

end, Anthony later secured financing for the construction of the home from a commercial lender.

Once the construction was completed, Anthony and Carol decided to move into one of the apartments in the new two-family home. At that time or shortly thereafter, the two began to experience problems in their marriage. At the same time, in approximately 2013, Anthony secured from a local bank new funding to recast the construction loan. As part of that transaction, Carol was placed on the deed.

At the time Anthony was securing the new funding, Francesco was aware of the marital difficulties Anthony and Carol were experiencing. In order to protect his loan to Anthony, Francesco contacted is long-time attorney, Arthur Balsamo, who prepared a note, mortgage, and deed that transferred title from Anthony individually to Anthony and Carol, as husband and wife.

Significantly, the note, which was signed by Anthony and Carol, contained a provision that addressed the possibility of Anthony and Carol divorcing. It stated the following: "I will pay principal and interest on demand or in the event the property secured by the mortgage which is being executed simultaneously herewith is sold or in the event of a divorce of the above named mortgagors." After the documents were signed, the mortgage and deed were

4

properly recorded. Notably, no payments were ever made by Anthony or Carol on the note nor did Francesco demand any at any time.

According to Anthony, after he signed the note and mortgage, his father's health declined. Just prior to having a scheduled surgery, and in light of his suffering from a life-threatening illness, Francesco sought to have a will drafted for his signature before he went into the hospital. He arranged to meet Balsamo for that purpose. Prior to meeting with the attorney, Francesco and Anthony discussed what provisions Francesco wanted to include in the will.

According to Anthony, at the time, his mother's health was also declining, his father had limited assets, and in fact, owed Carmela money on a loan. It was his father's intention that upon his death, Anthony would receive the payments he and Carol owed on their note, including any interest, so Anthony could continue the family business and take care of Anthony's mother.

Thereafter, the father and son met with Balsamo. According to Anthony and Balsamo, at the meeting, Francesco stated he wanted everything distributed to his wife and children. According to Anthony, that included his mother receiving the family home, his sister to be repaid some portion of the loan made to Francesco, and the family business going to Anthony, together with the balance owed on the Ridgefield property note. According to Balsamo, who

admittedly was not an expert in complex estate planning or related taxes, there was no mention of anything about making any bequests for tax saving or avoidance purposes.

Shortly thereafter, Balsamo completed the drafting of a will. Before meeting to sign the will, Anthony picked the draft up from the attorney and reviewed its contents with his father. Afterward, changes were made to the draft at Francesco's request. The final version was signed by Francesco on July 9, 2014. It named Anthony as the sole executor. When Francesco's met with Balsamo to sign the will, Anthony waited outside while Balsamo had a colleague interpret for him while he spoke to Francesco.

Among its various provisions, article three of the will addressed the note and mortgage signed by Anthony and Carol.[2] It stated the following:

> I do give, devise and bequeath the unpaid principal balance and accrued interest, if any, in and to a certain mortgage lien which I hold on the [Ridgefield] property . . . unto my son Anthony Ventre. It is my wish and I direct that such debt be forgiven and the mortgage lien cancelled of record by my [E]xecutor.

---

[2] Article seven contained a provision stating that if any beneficiary challenged the will, they were to be deprived any bequest made to them. No one ever challenged the will or contested it being admitted to probate at Francesco's death.

A-0011-21

According to Anthony and Balsamo, the language of the first sentence meant Anthony would receive the money he and Carol owed his father when his father died. However, according to Balsamo, the second sentence meant that the debt would be forgiven, and the lien discharged.

Francesco never told Balsamo that he intended to release Carol from the debt as Carol was never mentioned in any of their conversations about the will. Nevertheless, Balsamo understood that the language meant that Carol would be benefitted by the discharge of the mortgage and the debt's forgiveness because it was a joint and several obligation.

According to Balsamo, he was careful to confirm with Francesco he wanted the debt forgiven and the mortgage cancelled because the effect would be that Francesco's wife would not receive any portion of the funds owed once Francesco passed away. In response to Balsamo's inquiries, Francesco repeatedly stated he wanted the debt and lien cancelled so there would be no more debt. According to Balsamo, Francesco understood that Anthony and Carol would "have the property free and clear of the debt." Balsamo's notes from his meeting with Francesco made reference to Francesco wanting to "forgive this debt."

7

A-0011-21

Anthony understood article three's impact on Carol differently. He believed that since he, his father, nor Balsamo ever discussed Carol, his father did not intend to release her from the debt.

Francesco passed away in 2015.[3] Francesco's will was admitted to probate without objection or anyone contesting any portion of it.

As already noted, the dispute over Francesco's intention came up during Carol's and Anthony's divorce litigation. During that action, Carol's attorney sough to have Balsamo sign a certification addressing Francesco's intent. The document presented for Balsamo's signature stated that had he drafted Francesco's will to forgive both Anthony and Carol from the debt, and there would be a "transfer inheritance tax exposure" that was avoided by transferring the balance of the note to Anthony only. According to Balsamo, he did not draft the will, and in particular article three, to avoid any tax consequence. For that reason, the final form of his certification filed in the divorce action stated only that he "would be remiss if [he] failed to point out that [Carol's] status as a Class C beneficiary would have incurred an [eleven percent] transfer inheritance tax consequence had she been named as a beneficiary in her father-in-law's estate." However, Balsamo never discussed that tax consequence with Francesco, and

---

[3] His wife died in November 2021.

article three was not drafted based upon the tax consequences described in the certification he signed. He only signed the certification addressing the tax consequences because it was true, and Carol's attorney asked that it be included.

The final certification that Balsamo signed in the divorce action on July 22, 2019 also stated, in pertinent part, that the will "reflect[ed] Francesco['s] . . . intent to forgive the entire obligation evidenced by the attached note and the mortgage securing the same," and that "Francesco . . . made it clear to me that his intent was to forgive the entire 'debt' and that the mortgage instrument was to be cancelled of record."

After the dispute arose in the divorce action, Anthony filed this action in the Chancery Division, Probate Part in September 2020, seeking advice and instructions on the interpretation of his father's will. Carmela filed papers supporting the application but alternatively argued that if the transfer of Anthony's and Carol's debt failed, it should be included in the residuary estate, which benefited her. Carol opposed the action.

The Chancery judge conducted a three-day trial. At trial, Anthony, Balsamo, Carmela, and Carol testified. The testimony essentially described the events as already noted above. After considering that testimony, and the documents admitted into evidence, on July 19, 2021, the Chancery judge placed

9

his findings of facts and conclusions of law on the record that spanned approximately fifty transcript pages, before entering his final judgment two days later.

In his decision, the judge concluded that article three contained "an ambiguity . . . that ha[d] to be resolved" in that from reading the article's two sentences it was not clear whether Francesco intended to forgive the debt as to Anthony only or "that he want[ed] the entire debt forgiven." Relying on our Supreme Court's opinion in In re Estate of Munger, 63 N.J. 514, 521 (1973), the judge explained that the presence of the ambiguity called for application of the doctrine of probable intent. The judge, quoting from the Court's opinion, stated the following:

> The obligation of the Court when a question is presented, is to effectuate the [probable intent] of the testator when consideration of the will as a whole together with extrinsic evidence demonstrates under all the circumstances that a patent or latent ambiguity exists and the language used and as such intent overcoming the mere literal reading of the instrument is thereby made manifest.
>
> This power must be carefully exercised and should not be utilized unless the Court is thoroughly convinced that it is required.
>
> The need for its exercise must be manifest, otherwise exercise would amount to varying the terms

10

of the will as distinguished from merely effectuating a testator's intent.

The judge then reviewed in detail the witnesses' testimonies and determined that Anthony's and Balsamo's testimonies were the most significant. The judge found that Anthony's testimony was clouded by his involvement in the divorce litigation and his understanding of article three did not make sense, especially regarding his claim that the loan was only forgiven as to him, not Carol.

The judge found Balsamo was very credible, especially given his thirty-year relationship with Francesco and his familiarity with the entire family. The judge accepted Balsamo's testimony that once he was alone "behind closed doors" with his client, without Anthony, Francesco was "unequivocal" that he wanted the debt forgiven and the mortgage cancelled. Moreover, Balsamo found it "clear as day" that what Francesco "wanted was going to indirectly benefit Carol."

The judge concluded that Balsamo was not the type of person who would say anything a client or anyone else wanted if not true, as demonstrated by his refusal to sign the original certification presented by Carol's attorneys in the divorce and that Balsamo "never wavered" that the forgiveness of the debt was what Francesco wanted. The judge found that as Balsamo explained, the first

11

sentence of article three as the lawyer's language, and the second sentence was Francesco's, emphasizing that "he wanted the debt cancelled of record."

Relying on Balsamo's credible testimony, the judge concluded as follows:

> I cannot conclude based on the evidence before me that the plaintiff has proven by a preponderance of the evidence that the probable intent of the father was not to forgive Carol from this loan, it was just to forgive Anthony, and not discharge the entire loan, but bestowed upon him to now be the beneficiary of these mortgage payments that were never made.
>
> I don't think that has been proven by a preponderance, and like I said, on the flip side, if the burden of proof was on Carol Ventre, I think based on Balsamo's testimony, it would have been proven by a preponderance that to forgive the entire debt and to cancel the lien of record is what he did intend.
>
> . . . .
>
> And I give a lot of weight in Mr. Balsamo's testimony and deciphering word by word, line by line, sentence by sentence, and trying to reconstruct exactly how it happened.
>
> And, again, I think that those proofs were most persuasive to the Court.

Thereafter, the judge entered an order for judgment memorializing his decision. This appeal followed.

II.

A.

We begin by acknowledging that the scope of our view of a judgment entered in a nonjury case is limited. When "supported by adequate, substantial and credible evidence," a trial courts finding "are considered binding on appeal" and "should not be disturbed unless . . . 'they are so wholly insupportable as to result in a denial of justice.'" Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 483-84 (1974) (quoting Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App. Div.), aff'd o.b., 33 N.J. 78 (1960)). The final determinations made by the trial court, "premised on the testimony of witnesses and written evidence at a bench trial" are viewed in accordance with this deferential standard. D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). "[W]e do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interest of justice." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting In re Tr. Created by Agreement Dated Dec. 20, 1961 ex rel. Johnson, 194 N.J. 276, 284 (2008)). However, a trial court's legal determinations are not entitled to any special deference in our reviewed de novo. D'Agostino, 216 N.J. at 182 (citing

13

Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

B.

With these guiding principles in mind, we turn first to Anthony's argument on appeal that the trial judge's findings are unsupported by the evidence. We conclude that this contention is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Suffice it to say, the judge's findings were substantially supported by the judge's credibility determinations and Balsamo's testimony, which was supported by his notes. That testimony made it abundantly clear that upon his death, Francesco intended that the debt be forgiven and the mortgage cancelled, regardless of any indirect benefit to Carol. We have no cause to disturb the result based on the judge's findings.

C.

We reach a similar conclusion as to Anthony's contention that the judge misapplied the doctrine of probable intent. According to Anthony, the trial judge "failed to give primary emphasis to Francesco's dominant plan and purpose under his [w]ill when considered in light of the surrounding circumstances." We disagree.

14

"In interpreting a will, [the court's] aim is to ascertain the intent of the testator." In re Est. of Payne, 186 N.J. 324, 335 (2006). Our Supreme Court has adopted the "doctrine of probable intent," which recognizes courts should give "primary emphasis" to the testator's "dominant plan and purpose" as it appears "when read and considered in . . . light of the [will's] surrounding facts and circumstances." Ibid. (quoting Fid. Union Tr. Co. v. Robert, 36 N.J. 561, 564-65 (1962)).

The doctrine of probable intent is also codified in N.J.S.A. 3B:3-33.1. The statutory focus is to implement "[t]he intention of a testator . . . ." N.J.S.A. 3B:3-33.1(a). The doctrine of probable intent has "a 'broader and more liberal approach to will construction . . . .'" In re Est. of Flood, 417 N.J. Super. 378, 381 (App. Div. 2010) (quoting In re Est. of Burke, 48 N.J. 50, 63 (1966)).

"The doctrine of probable intent is not applicable where the documents are clear on their face and there is no failure of any bequest or provision." In re Est. of Gabrellian, 372 N.J. Super. 432, 443 (App. Div. 2004). "[P]resumed probable intent must be applied sparingly and only where necessary to give the effect to the intent of the will . . . without varying the terms of the document." Id. at 441.

15

In instances where intent of the will is unclear, "[t]he doctrine permits the reformation of a will in light of a testator's probable intent by 'searching out the probable meaning intended by the words and phrases in the will.'" Flood, 417 N.J. Super. at 381 (quoting Engle v. Siegel, 74 N.J. 287, 291 (1977)). "Moreover, extrinsic evidence may be offered not only to show an ambiguity in a will but also, if an ambiguity exists, 'to shed light on the testator's actual intent.'" Ibid. (quoting Wilson v. Flowers, 58 N.J. 250, 263 (1971)).

Interpretation of a term is confined to "the four corners of the document and the language therein . . . ." In re Tr. of Vander Poel, 396 N.J. Super. 218, 226 (App. Div. 2007). "To that end, in interpreting a will, courts in this State endeavor to 'ascertain the intent of the testator.'" In re Prob. Will of Lee, 389 N.J. Super. 22, 38 (App. Div. 2006) (quoting Payne, 186 N.J. at 335; see also In re Est. of Benner, 152 N.J. Super. 435, 441 (App. Div. 1977) ("[U]nder the doctrine of probable intent the court is obliged to put itself in the testator's position insofar as possible in the effort to accomplish what he would have done had he 'envisioned the present inquiry' . . . ." (quoting Fid. Union, 36 N.J. at 564-66)). The court subsequently "consider[s] the circumstances surrounding its execution and other extrinsic evidence of intention." Vander Poel, 396 N.J. Super. at 226 (citing Payne, 186 N.J. at 335; Fid. Union, 36 N.J. at 564-66; In

16

re Tr. Under Agreement of Voorhees, 93 N.J. Super. 293, 298-300 (App. Div. 1967)).  Furthermore,

> [t]he trial court is not "limited simply to searching out the probable meaning intended by the words and phrases in the will." [Engle, 74 N.J. at 291.] Extrinsic evidence may "furnish [] information regarding the circumstances surrounding the testator [and] should be admitted to aid in ascertaining [the testator's] probable intent under the will." [Flowers, 58 N.J. at 260.] To be sure, the testator's own expressions of his or her intent are highly relevant. Id. at 262-63. Once the evidence establishes the probable intent of the testator, "the court may not refuse to effectuate that intent by indulging in a merely literal reading of the instrument." Id. at 260.
>
> [Payne, 186 N.J. at 335 (third, fourth, and fifth alterations in original).]

Here, the trial judge immediately found that article three was ambiguous as to Francesco's intent and turned to extrinsic evidence of the circumstances that existed when the will was signed.  The judge especially focused on the close relationship between Anthony and his father and, as Balsamo was concerned, about the fact that the will proposed by Francesco not only negatively impacted his own wife but also Carmela.  From Balsamo's testimony it was clear that he and his client never spoke about Carol.  And, the fact that he did not expressly require her to remain liable under the note and mortgage he wanted cancelled

was consistent with the fact that while he was alive, he never demanded payment from either his son or his wife.

There was nothing in the evidence direct or extrinsic that supported the contention that Francesco intended that Carol remain liable for a loan originally taken by Anthony in his own name so that he could purchase the Ridgefield property. Simply stated, no one, not even Anthony, mentioned anything about Carol while discussing Francesco's will, the debt or the mortgage while the will was being drafted and when it was ultimately signed. The only thing that was certain was, according to Balsamo, that Francesco directed his attorney to include in his will a provision that directed the debt be forgiven and the mortgage discharged.

Under these circumstances, we find no error in the judge's application of the doctrine of probable intent.

D.

Last, we consider Anthony's challenge to the trial judge's evidentiary ruling, barring testimony about an alleged conversation between Francesco, his daughter, and Balsamo that supposedly took place after the will was signed. Specifically, according to a certification filed by Carmela in support of Anthony's initial filing in this action, she stated, in pertinent part, the following:

A-0011-21

> On October 22, 2014, my father and I had a meeting with Mr. Balsamo at his office. We discussed the distribution of my father's estate. At no time did Mr. Balsamo mention that Carol Ventre would be a beneficiary of my father's estate. He did not ever mention anything about Carol being any type of beneficiary, let alone a "Class C" beneficiary. At the meeting, Mr. Balsamo discussed the [t]hird paragraph of the [w]ill and specifically said that "the mortgage money" was to go to my brother.

At trial, Balsamo testified that he did not "remember ever meeting with" Carmela and Francesco together but did remember meeting with Carmela alone "on one, possibly two occasions," at some point after the will was signed. He explained that Carmela "was upset about the way she had been treated in the will, but [Balsamo] was not in a position where [he] could discuss the contents of her father's will."

When Anthony's attorney asked at trial if Balsamo "recall[ed] the details of those meetings," Carol's attorney objected, asserting that testimony about the meetings between Carmela and Balsamo that occurred after the will was signed was not relevant. Anthony's attorney argued that they were relevant because Francesco "was at the meeting" and any statement he made during the meeting was relevant.

After considering the parties' arguments, the judge sustained the objection. He explained his reasons as follows:

19

This is like three months later. I mean, these are self-serving statements of individuals who are going to benefit and . . . unless you're going to show me . . . some corroboration of something that was documented or whatever. It has to be made[] . . . in good faith and have the reliability to it . . . . These are . . . statements [made] three months later. [Francesco] could have changed his will a hundred times, but he didn't. [W]hat we're doing here today is [to determine] what he intended at the time he did it. Not other people's interpretations[ of] later on, so I'm going to sustain the objection.

. . . .

I mean, at some point we have to draw the line as to self-serving statements. [I]f they don't exist anywhere else. I mean, maybe when he took a recent dep[osition], but[] . . . this is many years ago now and you want me to weigh it as evidence of what he did three months prior, so I'm not going to allow it.

The day after Balsamo testified, Carmela took the stand. During her testimony, the judge allowed Carmela to testify as to various statements that she alleged her father made to her on a number of topics. They included Francesco's concern about Anthony's and Carol's marital arguments, their financial problems, and the possibility that they could not pay their first mortgage, thereby jeopardizing Francesco's mortgage that was his security for his loan to them.

Carmela also described what she viewed as the deterioration of the relationship between Carol and Francesco. According to Carmela, at one point, Carol gave her father "the finger," which, in her testimony, Carol denied.

Carmela also detailed her recollection of what occurred at the alleged meeting between her, her father, and Balsamo. According to Carmela, her father had a question about the will, which she could not specifically recall, that led to Balsamo telling them to come in to see him. Carmela described the topic of the meeting being her father questioning something about the "joint property clause" that addressed property Francesco owned with her mother. That developed into Balsamo allegedly reading the entire will out loud to her and her father, which she summarized for her father, "as best as [she] could," after each clause was read. Carmela also confirmed that Carol's obligation under the note and mortgage on the Ridgefield property was never discussed "during [the] entire meeting with . . . Balsamo."

Responding to Balsamo's statement that after Francesco's death she had "complained" about how she was treated under the will, Carmela stated the following about money her father owed her, which she never asked to be repaid prior to his death:

> When my father and I met with Mr. Balsamo I
> had indicated at that meeting, and this is probably why

Mr. Balsamo thinks I complained, but it was not a complaint, it was just mainly a concern that I had made, I had given money for the Union City project that you say is so profitable to help my father, due to a lien that was on that property. At that time, Mr. Balsamo jumped in and said, you know what? He goes, it's okay, let me explain it to you. That's a debt of the estate. If and when, nobody wanted my father to die, if and when, and it's not settled, he said, send me the paperwork and I will include it in your estate and that's why I did that. . . . I didn't know the involvement of the executor versus a lawyer so I did what Mr. Balsamo instructed me to do and I sent him a copy of the payment that I had made.

On appeal, Anthony argues that he should have been allowed "to explore . . . Balsamo's recollection of the detail of meetings with Francesco and Carmela concerning Francesco's [w]ill after the [w]ill had been signed" because anything Francesco said about "his understanding of the terms of his [w]ill are highly relevant," and under controlling case law "[c]ourts have routinely admitted testimony from the testator's attorney, as well as from family members and friends, concerning the testator's statements of intention even if the statements were made after the testator signed his [w]ill."

We review such evidentiary issues for an abuse of discretion. Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). "A trial court's decision to admit or exclude evidence generally is entitled to deference absent a showing

22

that the court abused its discretion such that the decision was so wide off the mark as to constitute a manifest injustice." E & H Steel Corp. v. PSEG Fossil, LLC, 455 N.J. Super. 12, 24-25 (App. Div. 2018) (citing Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

Applying our deferential standard of review, we conclude that Anthony's argument on this point is without merit. Balsamo did not recall that any meetings occurred between him, Francesco, and Carmela, so the premise to Anthony's contention was simply incorrect. Balsamo could not give details about a meeting that he testified he did not remember. Consistent with Anthony's legal contention, Balsamo and Anthony both testified as to what Francesco said at the meetings that they recalled. And, Balsamo testified about what occurred at his meetings with Carmela. Carmela also testified in detail about what she claims occurred at the meeting with Balsamo and essentially agreed with Balsamo about what occurred at the meeting he had with Carmela after the will was signed.

To the extent that the barred testimony related only to details about Balsamo's meeting with Carmela, that testimony was admitted and expanded upon by Carmela in her testimony. Under these circumstances, there was no abuse of the trial judge's discretion.

A-0011-21

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0011-21